# PRINCIPALITY OF MONACO *v.* MISSISSIPPI.

No. —, original.  Argued March 5, 1934.—Decided May 21, 1934.

*Messrs. Frederic R. Coudert* and *Dean Emery,* with whom *Messrs. Ethelbert Warfield, Frederic R. Kellogg,* and *Howard Thayer Kingsbury* were on the brief, for the Principality of Monaco.

*Mr. J. A. Lauderdale,* Assistant Attorney General of Mississippi, and *Mr. Greek L. Rice,* Attorney General, with whom *Mr. W. W. Pierce,* Assistant Attorney General, was on the brief, for Mississippi.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The Principality of Monaco asks leave to bring suit in this Court against the State of Mississippi upon bonds issued by the State and alleged to be the absolute property of the Principality.

The proposed declaration sets forth four causes of action. Two counts are upon bonds known as Mississippi Planters' Bank Bonds, dated March 1, 1833, the first count being upon eight bonds of $1,000 each, due March 1, 1861, and the second count upon two bonds of $1000 each, due March 1, 1866, all with interest at six per cent. per annum. The remaining two counts are upon bonds known as Mississippi Union Bank Bonds, the third count being on twenty bonds of $2,000 each, dated June 7, 1838, due February 5, 1850, and the fourth count upon twenty-five bonds of $2,000 each, dated June 6, 1838, due February 5, 1858, all with interest at five per cent. per annum. In each count it was alleged that the bonds were transferred and delivered to the Principality at its legation in Paris, France, on or about September 27, 1933, as an absolute gift. Accompanying the declaration and made a part of it is a letter of the donors, dated September 26, 1933, stating that the bonds had "been handed down from their respective families who purchased them at

the time of their issue by the State of Mississippi"; that the State had "long since defaulted on the principal and interest of these bonds, the holders of which have waited for some 90 years in the hope that the State would meet its obligations and make payment"; that the donors had been advised that there was no basis upon which they could maintain a suit against Mississippi on the bonds, but that "such a suit could only be maintained by a foreign government or one of the United States"; and that in these circumstances the donors were making an unconditional gift of the bonds to the Principality to be applied "to the causes of any of its charities, to the furtherance of its internal development or to the benefit of its citizens in such manner as it may select."

The State of Mississippi, in its return to the rule to show cause why leave should not be granted, raises the following objections: (1) that the Principality of Monaco is not a "foreign State" within the meaning of § 2, Article III, of the Constitution of the United States, and is therefore not authorized to bring a suit against a State; (2) that the State of Mississippi has not consented and does not consent that she be sued by the Principality of Monaco and that without such consent the State cannot be sued; (3) that the Constitution by § 10, clause 3, Article I, "forbids the State of Mississippi without the consent of Congress to enter into any compact or agreement with the Principality of Monaco, and no compact, agreement or contract has been entered into by the State with the Principality"; (4) that the proposed litigation is an attempt by the Principality "to evade the prohibitions of the Eleventh Amendment of the Constitution of the United States"; (5) that the proposed declaration does not state a controversy which is "justiciable under the Constitution of the United States and cognizable under the jurisdiction of this Court"; (6) that the alleged right of action "has long since been defeated and

extinguished " by reason of the completion of the period of limitation of action prescribed by the statutes of Mississippi; that the plaintiff and its predecessors in title have been guilty of laches, and that the right of action, if any, is now and for a long time has been stale.

The State contends that the holders of her bonds had a statutory right to sue the State by virtue of the Act of February 15, 1833 (Hutchinson's Code, 1798–1848, Chap. 54, Art. 11, § 1; *State* v. *Johnson,* 25 Miss. 625); that by the operation of a constitutional amendment in 1856 abolishing the Superior Court of Chancery, and until the adoption of the Code of 1871, the State had no statutory provision authorizing suits against her (*Whitney* v. *State,* 52 Miss. 732); that the Code of 1871 (§ 1573) provided that the State might be sued, and that Code had no statute of limitations in respect to bonds or contracts under seal; that a limitation of seven years as to actions upon such obligations was imposed by the Act of April 19, 1873 (Laws of 1873, Chap. 26) and that the statute of limitations against the bonds in question began to run on that date; that the right to sue the State conferred by the Code of 1871 was taken away by the Code of 1880, which became effective on November 1st of that year (*Gulf Export Co.* v. *State,* 112 Miss. 452; 73 So. 281); that meanwhile, in 1876, the Constitution of the State was amended so as to provide that the State should not " assume, redeem, secure, or pay any indebtedness or pretended indebtedness claimed to be due by the State of Mississippi, to any person, association or corporation whatsoever, claiming the same as owners, holders or assignees of any bond or bonds, now generally known as Union Bank Bonds, or Planters' Bank Bonds," that this provision was incorporated in the Constitution of 1890 (§ 258), and that since its adoption no foreign State could accept the bonds in question as a charitable donation in good faith.

In reply to these objections, the Principality asserts that she is a foreign State recognized as such by the Government of the United States; that the consent of the State of Mississippi is not necessary to give the Court jurisdiction; that the obligation of the State of Mississippi to pay her bonds is not an agreement or a compact with a foreign power within § 10, Clause 3, Article I, of the Constitution; that the action is not a subterfuge to evade the Eleventh Amendment; that the cause of action is justiciable; that no statute of limitations has run against the plaintiff or its predecessors, and that neither has been guilty of laches. Upon the last-mentioned points the Principality urges that, under the provisions of the statutes of Mississippi, holders of her bonds never had an enforceable remedy which could be said to be barred by the running of any state statute of limitations, and that the Principality will be prepared in the course of the suit to meet the defense of laches by showing the history of the efforts of the holders of the bonds to procure payment.

These contentions have been presented in oral argument as well as upon briefs. We find it necessary to deal with but one, that is, the question whether this Court has jurisdiction to entertain a suit brought by a foreign State against a State without her consent. That question, not hitherto determined, is now definitely presented.

The Principality relies upon the provisions of § 2 of Article III of the Constitution of the United States that the judicial power shall extend to controversies " between a State, or the Citizens thereof, and foreign States, Citizens or Subjects " (Clause one), and that in cases " in which a State shall be Party " this Court shall have original jurisdiction (Clause two). The absence of qualification requiring the consent of the State in the case of a suit by a foreign State is asserted to be controlling. And the point is stressed that the Eleventh Amendment

of the Constitution, providing that the judicial power shall not be construed to extend to any suit against one of the United States " by Citizens of another State, or by Citizens or Subjects of any Foreign State," contains no reference to a suit brought by a foreign State.

The argument drawn from the lack of an express requirement of consent to be sued is inconclusive. Thus there is no express provision that the United States may not be sued in the absence of consent. Clause one of § 2 of Article III extends the judicial power " to Controversies to which the United States shall be a Party." Literally, this includes such controversies, whether the United States be party plaintiff or defendant. *Williams* v. *United States,* 289 U.S. 553, 573. But by reason of the established doctrine of the immunity of the sovereign from suit except upon consent, the provision of Clause one of § 2 of Article III does not authorize the maintenance of suits against the United States. *Williams* v. *United States, supra;* compare *Cohens* v. *Virginia,* 6 Wheat. 264, 411, 412; *Minnesota* v. *Hitchcock,* 185 U.S. 373, 384, 386; *Kansas* v. *United States,* 204 U.S. 331, 341, 342. And while Clause two of § 2 of Article III gives this Court original jurisdiction in those cases in which " a State shall be Party," this Court has no jurisdiction of a suit by a State against the United States in the absence of consent, *Kansas* v. *United States, supra.* Clause two merely distributes the jurisdiction conferred by Clause one, and deals with cases in which resort may be had to the original jurisdiction of this Court in the exercise of the judicial power as previously given. *Duhne* v. *New Jersey,* 251 U.S. 311, 314.

Similarly, neither the literal sweep of the words of Clause one of § 2 of Article III, nor the absence of restriction in the letter of the Eleventh Amendment, permits the conclusion that in all controversies of the sort described in Clause one, and omitted from the words of the Eleventh Amendment, a State may be sued without her consent.

Thus Clause one specifically provides that the judicial Power shall extend " to *all* Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." But, although a case may arise under the Constitution and laws of the United States, the judicial power does not extend to it if the suit is sought to be prosecuted against a State, without her consent, by one of her own citizens. *Hans* v. *Louisiana,* 134 U.S. 1; *Duhne* v. *New Jersey, supra,* p. 311. The requirement of consent is necessarily implied. The State has the same immunity in case of a suit brought by a corporation created by Act of Congress. *Smith* v. *Reeves,* 178 U.S. 436. Yet in neither case is the suit within the express prohibition of the Eleventh Amendment. Again, the Eleventh Amendment mentions only suits " in law or equity"; it does not refer to suits in admiralty. But this Court has held that the Amendment does not " leave open a suit against a State in the admiralty jurisdiction by individuals, whether its own citizens or not." *Ex Parte State of New York, No. 1,* 256 U.S. 490, 498.

Manifestly, we cannot rest with a mere literal application of the words of § 2 of Article III, or assume that the letter of the Eleventh Amendment exhausts the restrictions upon suits against non-consenting States. Behind the words of the constitutional provisions are postulates which limit and control. There is the essential postulate that the controversies, as contemplated, shall be found to be of a justiciable character. There is also the postulate that States of the Union, still possessing attributes of sovereignty,[1] shall be immune from suits, without their consent, save where there has been "a surrender of this

---

[1] See *Briscoe* v. *Bank of Kentucky,* 11 Pet. 257, 321; *Darrington* v. *Bank of Alabama,* 13 How. 12, 17; *Beers* v. *Arkansas,* 20 How. 527, 529; *In re Ayers,* 123 U.S. 443, 505.

immunity in the plan of the convention." The Federalist, No. 81. The question is whether the plan of the Constitution involves the surrender of immunity when the suit is brought against a State, without her consent, by a foreign State.

The debates in the Constitutional Convention do not disclose a discussion of this question. But Madison, in the Virginia Convention, answering objections to the ratification of the Constitution, clearly stated his view as to the purpose and effect of the provision conferring jurisdiction over controversies between States of the Union and foreign States. That purpose was suitably to provide for adjudication in such cases if consent should be given but not otherwise.[2] Madison said: " The next case provides for disputes between a foreign state and one of our states, should such a case ever arise; and between a citizen and a foreign citizen or subject. I do not conceive that any controversy can ever be decided, in these courts, between

---

[2] There is no question but that foreign States may sue private parties in the federal courts. *King of Spain* v. *Oliver,* 2 Wash.C.C. 429; *The Sapphire,* 11 Wall. 164. In the latter case the court said (pp. 167, 168): " Our own government has largely availed itself of the like privilege to bring suits in the English courts in cases growing out of our late civil war. Twelve or more of such suits are enumerated in the brief of the appellees, brought within the last five years in the English law, chancery, and admiralty courts. There are numerous cases in the English reports in which suits of foreign sovereigns have been sustained, though it is held that a sovereign cannot be forced into court by suit." (Cases cited.) In *Kingdom of Roumania* v. *Guaranty Trust Co.,* 250 Fed. 341, the court held that the bringing of an action by a foreign nation in a court of the United States to recover a deposit placed to its credit in a bank was not a waiver of its immunity as a sovereign from suit by other parties, and hence that the court was without jurisdiction to permit the defendant by interpleader to substitute as defendant another party claiming a lien on the deposit as a creditor of the plaintiff. See, also, *Colombia* v. *Cauca Co.,* 190 U.S. 524; *Ex parte Muir,* 254 U.S. 522.

an American state and a foreign state, without the consent of the parties. If they consent, provision is here made." 3 Elliot's Debates, 533.

Marshall, in the same Convention, expressed a similar view. Replying to an objection as to the admissibility of a suit by a foreign state, Marshall said: " He objects, in the next place, to its jurisdiction in controversies between a state and a foreign state. Suppose, says he, in such a suit, a foreign state is cast; will she be bound by the decision? If a foreign state brought a suit against the commonwealth of Virginia, would she not be barred from the claim if the federal judiciary thought it unjust? The previous consent of the parties is necessary; and, as the federal judiciary will decide, each party will acquiesce." 3 Elliot's Debates, 557.[3]

Hamilton, in The Federalist, No. 81, made the following emphatic statement of the general principle of immunity: " It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States, and the danger intimated must be merely ideal. The circumstances which are necessary to produce an alienation of State sovereignty were discussed in considering the article of taxation and need not be repeated here. A recurrence to the principles there established will satisfy us that there is no color to pretend that the State governments would by the adoption of that plan be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith.

---

[3] See Story on the Constitution, § 1699; Willoughby on the Constitution (2d ed.), § 885.

The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action independent of the sovereign will. To what purpose would it be to authorize suits against States for the debts they owe? How could recoveries be enforced? It is evident it could not be done without waging war against the contracting State; and to ascribe to the federal courts by mere implication, and in destruction of a pre-existing right of the State governments, a power which would involve such a consequence would be altogether forced and unwarrantable." [4]

It is true that, despite these cogent statements of the views which prevailed when the Constitution was ratified, the Court held, in *Chisholm* v. *Georgia,* 2 Dall. 419, over the vigorous dissent of Mr. Justice Iredell,[5] that a State was liable to suit by a citizen of another State or of a foreign country. But this decision created such a shock of surprise that the Eleventh Amendment was at once proposed and adopted. As the Amendment did not in terms apply to a suit against a State by its own citizen, the Court had occasion, when that question was presented in *Hans* v. *Louisiana, supra* (a case alleged to arise under the Constitution of the United States), to give elaborate consideration to the application of the general principle of the immunity of States from suits brought against them without their consent. Mr. Justice Bradley delivered the opinion of the Court and, in view of the importance of the question, we quote at length from that opinion to show the reasoning which

[4] For statements by Madison and Marshall in the Virginia Convention in relation to the non-suability of States by individuals, see 3 Elliot's Debates, 533, 555.

[5] For comment upon the force of this dissent, see *Hans* v. *Louisiana,* 134 U.S. 1, 12, 14; *Williams* v. *United States,* 289 U.S. 553, 574, 576, 577.

led to the decision that the suit could not be maintained. The Court said (134 U.S. pp. 12 *et seq.*): " Looking back from our present standpoint at the decision in *Chisholm* v. *Georgia,* we do not greatly wonder at the effect which it had upon the country. Any such power as that of authorizing the federal judiciary to entertain suits by individuals against the States, had been expressly disclaimed, and even resented, by the great defenders of the Constitution, whilst it was on its trial before the American people." After quoting the statements of Hamilton, Madison and Marshall, the Court continued: " It seems to us that these views of those great advocates and defenders of the Constitution were most sensible and just; and they apply equally to the present case as to that then under discussion. The letter is appealed to now, as it was then, as a ground for sustaining a suit brought by an individual against a State. The reason against it is as strong in this case as it was in that. It is an attempt to strain the Constitution and the law to a construction never imagined or dreamed of. Can we suppose that, when the Eleventh Amendment was adopted, it was understood to be left open for citizens of a State to sue their own state in the federal courts, whilst the idea of suits by citizens of other states, or of foreign states, was indignantly repelled? Suppose that Congress, when proposing the Eleventh Amendment, had appended to it a proviso that nothing therein contained should prevent a State from being sued by its own citizens in cases arising under the Constitution or laws of the United States: can we imagine that it would have been adopted by the States? The supposition that it would is almost an absurdity on its face.

" The truth is, that the cognizance of suits and actions unknown to the law, and forbidden by the law, was not contemplated by the Constitution, when establishing the judicial power of the United States. . . .

" The suability of a State without its consent was a thing unknown to the law. This has been so often laid down and acknowledged by courts and jurists that it is hardly necessary to be formally asserted. It was fully shown by an exhaustive examination of the old law by Mr. Justice Iredell in his opinion in *Chisholm* v. *Georgia;* and it has been conceded in every case since, where the question has, in any way, been presented, even in the cases which have gone farthest in sustaining suits against the officers or agents of States."

The Court then adverted to observations of Chief Justice Marshall in *Cohens* v. *Virginia,* 6 Wheat. 264, which favored the argument of the plaintiff in error, but as those observations were unnecessary to the decision in the case of *Cohens,* the Court was of the opinion that they should not " outweigh the important considerations referred to which lead to a different conclusion." [6]

The same principle of immunity was reiterated and applied by the Court, upon the authority of *Hans* v. *Louisiana,* in *Smith* v. *Reeves, supra,* in deciding that a federal corporation could not sue a State without her consent, although, as we have seen, such a suit was not listed in the specific prohibitions of the Eleventh Amendment.

In the case of *South Dakota* v. *North Carolina,* 192 U.S. 286, 318, the Court observed that the expression in the opinion in *Hans* v. *Louisiana* of concurrence in the views announced by Mr. Justice Iredell in his dissenting opinion in *Chisholm* v. *Georgia,* could not be considered as a judgment of the Court, in view of the point which *Hans* v. *Louisiana* actually decided. But *South Dakota* v. *North Carolina* did not disturb the ruling in *Hans* v. *Louisiana* or the principle which that decision applied.

[6] See *Missouri* v. *Illinois,* 180 U.S. 208, 240; *New Hampshire* v. *Louisiana,* 108 U.S. 76.

*South Dakota* v. *North Carolina* was a suit by one State against another State and did not present the question of the maintenance either of a suit by individuals against a State or by a foreign State against a State. As a suit by one State against another State, it involved a distinct and essential principle of the constitutional plan which provided means for the judicial settlement of controversies between States of the Union, a principle which necessarily operates regardless of the consent of the defendant State. The reasoning of the Court in *Hans* v. *Louisiana* with respect to the general principle of sovereign immunity from suits was recently reviewed and approved in *Williams* v. *United States, supra.*

The question of that immunity, in the light of the provisions of Clause one of § 2 of Article III of the Constitution, is thus presented in several distinct classes of cases, that is, in those brought against a State (a) by another State of the Union; (b) by the United States; (c) by the citizens of another State or by the citizens or subjects of a foreign State; (d) by citizens of the same State or by federal corporations; and (e) by foreign States. Each of these classes has its characteristic aspect, from the standpoint of the effect, upon sovereign immunity from suits, which has been produced by the constitutional scheme.

■ The establishment of a permanent tribunal with adequate authority to determine controversies between the States, in place of an inadequate scheme of arbitration, was essential to the peace of the Union. The Federalist, No. 80; Story on the Constitution, § 1679. With respect to such controversies, the States by the adoption of the Constitution, acting " in their highest sovereign capacity, in the convention of the people," waived their exemption from judicial power. The jurisdiction of this Court over the parties in such cases was thus established

" by their own consent and delegated authority " as a necessary feature of the formation of a more perfect Union. *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 720; *Louisiana* v. *Texas*, 176 U.S. 1, 16, 17; *Missouri* v. *Illinois*, 180 U.S. 208, 240, 241; *Kansas* v. *Colorado*, 185 U.S. 125, 142, 144; 206 U.S. 46, 83, 85; *Virginia* v. *West Virginia*, 246 U.S. 565.

■ Upon a similar basis rests the jurisdiction of this Court of a suit by the United States against a State, albeit without the consent of the latter. While that jurisdiction is not conferred by the Constitution in express words, it is inherent in the constitutional plan. *United States* v. *North Carolina*, 136 U.S. 211; *United States* v. *Texas*, 143 U.S. 621, 644, 645; 162 U.S. 1, 90; *United States* v. *Michigan*, 190 U.S. 379, 396; *Oklahoma* v. *Texas*, 258 U.S. 574, 581; *United States* v. *Minnesota*, 270 U.S. 181, 195. Without such a provision, as this Court said in *United States* v. *Texas, supra,* " the permanence of the Union might be endangered."

■ To suits against a State, without her consent, brought by citizens of another State or by citizens or subjects of a foreign State, the Eleventh Amendment erected an absolute bar. Superseding the decision in *Chisholm* v. *Georgia, supra,* the Amendment established in effective operation the principle asserted by Madison, Hamilton, and Marshall in expounding the Constitution and advocating its ratification. The " entire judicial power granted by the Constitution " does not embrace authority to entertain such suits in the absence of the State's consent. *Ex parte State of New York, No. 1, supra,* p. 497; *Missouri* v. *Fiske,* 290 U.S. 18, 25, 26.

■ Protected by the same fundamental principle, the States, in the absence of consent, are immune from suits brought against them by their own citizens or by federal corporations, although such suits are not within the ex-

plicit prohibitions of the Eleventh Amendment. *Hans* v. *Louisiana, supra; Smith* v. *Reeves, supra; Duhne* v. *New Jersey, supra; Ex parte State of New York, No. 1, supra.*

■ We are of the opinion that the same principle applies to suits against a State by a foreign State. The decision in *Cherokee Nation* v. *Georgia,* 5 Pet. 1, is not opposed, as it rested upon the determination that the Cherokee nation was not a "foreign State" in the sense in which the term is used in the Constitution. The question now before us necessarily remained an open one. We think that Madison correctly interpreted Clause one of § 2 of Article III of the Constitution as making provision for jurisdiction of a suit against a State by a foreign State in the event of the State's consent but not otherwise. In such a case, the grounds of coercive jurisdiction which are present in suits to determine controversies between States of the Union, or in suits brought by the United States against a State, are not present. The foreign State lies outside the structure of the Union. The waiver or consent, on the part of a State, which inheres in the acceptance of the constitutional plan, runs to the other States who have likewise accepted that plan, and to the United States as the sovereign which the Constitution creates. We perceive no ground upon which it can be said that any waiver or consent by a State of the Union has run in favor of a foreign State. As to suits brought by a foreign State, we think that the States of the Union retain the same immunity that they enjoy with respect to suits by individuals whether citizens of the United States or citizens or subjects of a foreign State. The foreign State enjoys a similar sovereign immunity and without her consent may not be sued by a State of the Union.

The question of the right of suit by a foreign State against a State of the Union is not limited to cases of

alleged debts or of obligations issued by a State and claimed to have been acquired by transfer. Controversies between a State and a foreign State may involve international questions in relation to which the United States has a sovereign prerogative. One of the most frequent occasions for the exercise of the jurisdiction granted by the Constitution over controversies between States of the Union has been found in disputes over territorial boundaries. See *Rhode Island* v. *Massachusetts, supra,* p. 737. Questions have also arisen with respect to the obstruction of navigation, *South Carolina* v. *Georgia,* 93 U.S. 4; the pollution of streams, *Missouri* v. *Illinois,* 180 U.S. 208; 200 U.S. 496; and the diversion of navigable waters, *Wisconsin* v. *Illinois,* 278 U.S. 367; 289 U.S. 395, 400. But in the case of such a controversy with a foreign power, a State has no prerogative of adjustment. No State can enter " into any Treaty, Alliance, or Confederation " or, without the consent of Congress, " into any Agreement or Compact with a foreign Power." Const. Art. I, § 10. The National Government, by virtue of its control of our foreign relations is entitled to employ the resources of diplomatic negotiations and to effect such an international settlement as may be found to be appropriate, through treaty, agreement of arbitration, or otherwise. It cannot be supposed that it was the intention that a controversy growing out of the action of a State, which involves a matter of national concern and which is said to affect injuriously the interests of a foreign State, or a dispute arising from conflicting claims of a State of the Union and a foreign State as to territorial boundaries, should be taken out of the sphere of international negotiations and adjustment through a resort by the foreign State to a suit under the provisions of § 2 of Article III. In such a case, the State has immunity from suit without her consent and the National Government is protected by the

provision prohibiting agreements between States and foreign powers in the absence of the consent of the Congress. While, in this instance, the proposed suit does not raise a question of national concern, the constitutional provision which is said to confer jurisdiction should be construed in the light of all its applications.

We conclude that the Principality of Monaco, with respect to the right to maintain the proposed suit, is in no better case than the donors of the bonds, and that the application for leave to sue must be denied.

*Rule discharged and leave denied.*