UNITED STATES of America, Plaintiff,

v.

PENNSYLVANIA ENVIRONMENTAL HEARING BOARD et al., Defendants.

Civ. No. 73–454S.

United States District Court,
M. D. Pennsylvania.

May 5, 1977.

---

James W. Walker, Scranton, Pa., for plaintiff.

Dennis J. Harnish, Dept. of Environmental Resources, Karin W. Carter, Harrisburg, Pa., for defendants.

## OPINION

MUIR, District Judge.

The above-captioned case was originally assigned to the late Chief Judge Sheridan.

Following his death, it was reassigned to the undersigned judge on October 1, 1976. The matter is now before the Court on a case stated filed March 18, 1977 followed by the Government's motion for summary judgment. The matter became ripe for decision on April 27, 1977 upon completion of the briefing schedule. The following facts have been agreed upon by the parties and are presented in the precise wording of their stipulation.

## I. Findings of Fact.

1. The United States of America is the owner of the premises, and all of the equipment and installations situated in the city of Scranton, Pennsylvania, and known as the Scranton Army Ammunition Plant.

2. On August 16, 1971, Lt. Col. Daniel E. Duggan, U.S. Army, assumed command of this federal facility, which command extended through December, 1972.

3. Chamberlain Manufacturing Corporation is a foreign corporation, organized and existing under the laws of the state of Iowa, and having a certificate of authority to do business in the Commonwealth of Pennsylvania.

4. Chamberlain operates the Scranton Army Ammunition Plant under a facilities contract with the United States of America.

5. From June 13, 1963 through June 30, 1971, the document embodying the contract referred to in paragraph 4 was designated as DA–36–034–AMC–0163A.

6. From July 1, 1971 to date, the document embodying the contract referred to in paragraph 4 was designated as DAA09–71–C–0257.

7. The Scranton Army Ammunition Plant consists of six (6) buildings including three (3) production buildings on 15.3 acres of land.

8. The primary function of the plant is the production of metal parts for 155mm. and 175mm. ammunition shells pursuant to a separate supply contract with the United States of America.

9. Chamberlain, Scranton Division, was the only responsive producer in the United States of the 175mm. shell metal parts of satisfactory quality during the period 1963 through 1972.

10. The production of 175mm. shell metal parts was required to meet the U.S. Army's critical need for this ammunition.

11. These shells supplied much of the long-range artillery for the Vietnam conflict.

12. The plant has three different water collection systems: domestic, industrial and storm.

13. From July 1, 1970, to October 4, 1972, operation of the plant by Chamberlain resulted in the discharge of 1.5 million gallons per day of untreated industrial wastes from the plant into Roaring Brook, a tributary of the Lackawanna River.

14. The plant had no industrial waste discharge permit from the Pennsylvania Department of Environmental Resources. (DER).

15. A report on waste disposal practices at the plant dated November, 1970, was prepared by the federal water pollution control administration of the U.S. Department of Interior for the Army Materiel Command, and a copy of this report was furnished to DER.

16. Chamberlain never notified DER of any particular pollutional discharge into Roaring Brook.

17. A large portion of the industrial waste discharge originated in that portion of the plant known as the forge shop.

18. The forge shop waste waters consisted of cooling water, waste water from forge presses, leakage and exhaust water from the high pressure hydraulic system, and floor drainage, the principal pollutants being grease and oil from the high pressure hydraulic system used in, and metal pollutants heated by the production process.

19. Other portions of the industrial waste discharge were related to the maintenance of the plant, e.g., floor drains discharging directly into Roaring Brook were covered with a thick coating of graphite grease.

20. Roaring Brook was in relatively good condition biologically upstream from the plant. Pollution sensitive invertebrates and fish lived in that portion of the stream.

21. As a result of the industrial waste discharge, no fish could have lived within a half mile of the plant, and the lower life forms were also depressed.

22. From July 1, 1970 through October 4, 1972, Chamberlain knew that its operation of the plant and the attendant discharge of industrial wastes from the plant caused substantial pollution of Roaring Brook.

23. Commencing at least in 1966, Chamberlain undertook a series of pollution abatement actions.

24. In November, 1966, Chamberlain initiated action to remove a water/hydraulic forge press and completed installation of a closed loop oil hydraulic press on February 26, 1968. This action reduced polluted water leakage from water/hydraulic presses by 1/6 at a cost of $897,415.00.

25. On January 3, 1968, Chamberlain installed a closed loop oil hydraulic forge press (John Deere), permitting removal of a water/hydraulic press. This action reduced polluted water leakage from water/hydraulic presses by an additional 1/6 at a cost of $64,303.00.

26. During the period 1966 through 1972, Chamberlain rehabilitated remaining water/hydraulic press lines thus reducing pollution through leakage.

27. On July 29, 1970, Chamberlain initiated action to remove the # 6 forge press. This action, completed on November 20, 1970, removed the potential pollution inherent in a water press line. Cost of this project was $7,478.14.

28. Commencing on March 31, 1970, the remaining hydraulic press forge lines were rehabilitated, reducing the pollution emanating from leaky water lines. This effort was completed on November 16, 1970, at a cost of $33,596.18.

29. In November and December of 1970, a dike was constructed around the oil storage tanks. This eliminated the possibility of discharging 20,000 gallons of quench oil into Roaring Brook should the tanks rupture. The cost of this project was $7,157.00.

30. During this same period Chamberlain installed a cleaning tank for tube bundle cleaning. This action eliminated the potential pollution of the brook by confining the caustics and oil sludge in a tank.

31. On October 19, 1970, action was taken to install two open tanks beneath the sulphuric acid tank, eliminating the possibility of discharging 3,000 gallons of sulphuric acid into Roaring Brook. The catch tanks were completed in February, 1971, at a cost of $2,630.00.

32. On August 27, 1970, a water recirculation system was initiated. This system reduced the flow of heat exchanger cooling water to Roaring Brook by 3,600 gallons per minute at heat treat and 1,440 gallons per minute at the production shop. This allowed the planning for zero flow to Roaring Brook. The project was completed on September 7, 1971, at a cost of $387,029.34.

33. A rehabilitation project for the high pressure water system was started on March 31, 1969, which reduced the pollution potential to the brook. It was completed on March 23, 1970, at a cost of $57,245.20.

34. During the same time frame as above, the low pressure water system was rehabilitated. The cost is included in paragraph 33.

35. On June 26, 1972, the installation of a divergent water system was commenced. This system uses sumps to collect leakage, then recirculates the fluid through filters back to the supply. Thousands of gallons of soluble oil bearing water were thus prevented from entering Roaring Brook. Cost of this system was $38,942.00.

36. In this same time period Chamberlain rerouted the floor drains, originally designed to discharge into the brook, into the sanitary sewer for treatment. This action eliminated the potential of the pollutants reaching the brook.

37. From June 21, 1971, through December 20, 1971, Numbers 3 and 4 press lines

were removed. This action removed the pollution potential of the two water press lines. Cost was $22,045.19.

38. On January 12, 1971, action was taken to install a water monitoring station at the plant. This provided a means of checking quality and quantity of waste discharge to the sanitary sewer. A subsequent project provided equipment to check the flow to Roaring Brook. Cost of this project was $8,446.00.

39. Installation of the new Erie forge press line commenced on April 16, 1970. The Bliss III forge press line was started on December 22, 1970. These two lines with self contained systems eliminate the pollution potential of water press lines. The cost of these two systems is $2,922,375.80.

40. On April 16, 1970, the installation of the Bliss I forge press line started. It contains only one hydraulic press and a sump for recovery, all waste being discharged into the sanitary sewer. The cost of this line was $1,016,305.00.

41. The last new forge press line, Bliss II, was started at the same time, April 16, 1970. It presents the same benefits described above. Cost of this line was $1,016,305.00.

42. On or about October 16, 1972, the pollution abatement actions set forth in paragraphs 24 through 41, resulted in the abatement of the plant's industrial waste discharge.

43. Chamberlain needed the approval of the Department of the Army prior to the implementation of the foregoing pollution abatement actions, in order to obtain reimbursement.

44. The foregoing pollution abatement actions were generally the result of a four year project cycle involving preparation, budgeting and budget apportionment by the Department of the Army, and execution. Even an emergency project, submitted to the Department of the Army under unusual circumstances, required a year or more for work to commence.

45. Chamberlain could have abated pollution by terminating its facilities contract with the United States of America pursuant to Article N, thereof. In doing so, Chamberlain would have breached its supply contract with the United States of America for the production of shell metal parts at the Scranton facility.

46. Since 1937 the Commonwealth of Pennsylvania has regulated the discharge of pollutants to its streams under its Clean Streams Law.

47. Effective July 31, 1970, the Clean Streams Law was strengthened by the addition of a civil penalties section which provided for an initial fine for violations of the act and rules and regulations, thereunder, of up to $10,000.00 for the initial violation plus $500.00 for each day of continuing violation.

48. Chamberlain's discharge of oily wastes having more than 30 parts per million of oil to Roaring Brook was determined by the Board to be a violation of § 95.3 and § 97.63 of rules and regulations promulgated under the Clean Streams Law.

49. Chamberlain's discharge of industrial wastes containing heavy metals such as lead, copper, zinc and cadmium compounds in amounts harmful to aquatic life was determined by the Board to be a violation of § 95.3, § 97.14 and § 101.3 of the rules and regulations promulgated under the Clean Streams Law, as well as § 307 and § 401 of that Act, 35 P.S. § 691.307 and § 691.401.

50. Chamberlain's discharge of industrial waste to Roaring Brook without a permit was determined by the Board to be a violation of § 301 and § 307 of the Clean Streams Law, 35 P.S. § 691.301 and § 691.307.

51. Chamberlain introduced toxic substances into Roaring Brook which resulted in pollution of these waters without notifying the Pennsylvania Department of Environmental Resources (DER) so that action might be taken to minimize harm to the environment and to the health of the people of the Commonwealth and the United States; this failure to notify was determined by the Board to be a violation of

§ 101.2 of the rules and regulations promulgated under Clean Streams Law.

52. Civil penalties are assessed by the Pennsylvania Environmental Hearing Board (the Board) which is a quasi-judicial body composed of three attorneys appointed by the Governor on the basis of their particular experience in environmental matters.

53. In assessing civil penalties, under the Clean Streams Law, the Board is required to consider among other matters, the amount of damage to the waters of the Commonwealth caused by the violation for which penalties are sought and the willfulness of the violation, i. e., was the violation knowing, negligent, accidental, etc.

54. Judicial review of decisions of the Board may be obtained from the Commonwealth Court of Pennsylvania if an appeal is filed in a timely manner.

55. Following unsuccessful negotiations among DER, Department of the Army and Chamberlain, conducted between the period of May and September of 1972 concerning the above-stated violations, on September 5, 1972, DER filed a complaint for civil penalties against *inter alia* Chamberlain.

56. No answer having been filed to DER's complaint, as of October 18, 1972, a default adjudication was entered by the Board against Chamberlain on the issue of liability for civil penalties, and a hearing for the purpose of fixing the amount of penalties was scheduled for November 10, 1972; this hearing was continued until December 18, 1972.

57. On December 18, 1972, James W. Walker, Assistant U.S. Attorney made a limited appearance on behalf of the defendants to argue that the Board lacked jurisdiction to ". . . impose fines or penalties upon federal employees or federally operated facilities . . ."

58. In the adjudication of the Board, to which the present action is directed, the Board exacted the maximum penalty of initially $10,000 plus $500 per day for each of several violations since the Board found that the damage to Roaring Brook caused by these violations was great and the willfulness of Chamberlain Manufacturing Company was "extreme".

59. The Board's total penalty of $1,667,000.00 was based upon the following partial assessments:

60. For the Board's finding of a violation set forth in paragraph 48, discharge of oil, $10,000 plus $500 per day for the period from August 1, 1970, through October 4, 1972, the day upon which the last test for oil discharge was conducted, a period of 796 days; the total was $398,000.00.

61. For the Board's finding of a violation set forth in paragraph 49, discharge of heavy metals, $10,000 plus $500 for each day of violation for the period from August 1, 1970 through October 4, 1972, the day upon which the last test for heavy metals was conducted, a period of 796 days; the total was $398,000.00.

62. For the Board's finding of a violation set forth in paragraph 50, discharge of industrial wastes without a permit, $10,000 plus $500 for each day from August 1, 1970 through December 18, 1972, the date of the hearing, a period of 871 days; the total was $435,500.00, (at the hearing, Chamberlain's agent acknowledged that he knew about the requirement to obtain a state permit, but failed to apply for one on advice of counsel).

63. For the Board's finding of a violation set forth in paragraph 51, failure to notify of a toxic discharge, $10,000 plus $500 for each day from August 1, 1970 through December 18, 1972, the day of the hearing, a period of 871 days; the total was $435,500.00, (at the hearing, Chamberlain's agent acknowledged that Chamberlain had never notified the Board of any discharge).

64. The Board concluded that each of the findings set forth in paragraphs 48 through 51 constituted a separate violation of the Clean Streams Law; the Board found heavy metals and oil to be different pollutants with different effects and different treatment methods. The Board also found the notification and permit requirements different from the oil and heavy metals violations and from one another

since they are not simply different ways of proscribing the same conduct.

65. Copies of Contract Nos. DA–36–034–AMC–0163A, identified as Contract No. 1, and DAA09–71–C–0257, identified as Contract No. 2, together with a copy of the Board's Adjudication, identified as Adjudication, dated July 31, 1973, are a part of the record as joint exhibits of the parties.

## II. Discussion.

As of July 1, 1972, there existed in the United States 18 government-owned, contractor-managed ammunition complexes "in active manufacturing status." See Government Exhibit 1 attached to its March 31, 1977 brief in support of the motion for summary judgment. One of those plants sits on the banks of Roaring Brook, a tributary of the Lackawanna River, in Scranton, Pennsylvania and, during the period pertinent to this case, produced long-range artillery shells under the auspices of the Chamberlain Manufacturing Company. During this time, the military officer overseeing the operation, the so-called "Contracting Officer's Representative", was Lieutenant Colonel Daniel E. Duggan.

On October 19, 1972, Defendant Pennsylvania Environmental Hearing Board (hereinafter the "Board") issued a default adjudication against the Secretary of the Army, Duggan, and Chamberlain for violations of Pennsylvania water pollution standards.

On July 31, 1973, after a hearing, the Board levied a civil penalty of $1,667,000 against Duggan and Chamberlain. On August 22, 1973, the United States filed the above-captioned case requesting:

(a) That the relevant section of the Pennsylvania Clean Streams Law, July 31, 1970, P.L. 653, No. 222, § 16, 35 P.S. 691.605, be declared inapplicable to and unenforceable against the United States, its officers, or its agents.

(b) That the civil penalty levied against Duggan and Chamberlain be declared invalid;

(c) That the civil penalty be declared null and void as a basis for any liens; and

(d) That the Board be permanently enjoined from enforcing and collecting the aforementioned civil penalty from the United States, its officers or its agents. No appearance has been made by Chamberlain. By stipulation, Duggan has been relieved of any potential liability.

■ Federal installations and activities are shielded from regulation by the States unless there is a clear and specific Congressional mandate which unambiguously authorizes state regulation. *Hancock v. Train*, 426 U.S. 167, 179, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976); *Paul v. United States*, 371 U.S. 245, 263, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 122, 74 S.Ct. 403, 98 L.Ed. 546 (1954); *California ex rel State Water Resources Control Board v. EPA*, 511 F.2d 963, 968 (9th Cir. 1975). The Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 et seq., grant the States some power to regulate federal facilities with respect to the discharge of effluents: "Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants shall comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements . . . ." § 313 of the Amendment, 33 U.S.C. § 1323. To enforce compliance, a citizen may commence a civil action in a district court "against any person (including . . . the United States . . . ) who is alleged to be in violation of . . . an effluent standard or limitation under this chapter". § 505(a)(1) of the Amendments, 33 U.S.C. § 1365(a)(1). Except for a reference to "emission standard" in lieu of "effluent standard", the Federal Clean Air Act contains an identical provision, 42 U.S.C. § 1857h–2, which the Supreme Court has interpreted as creating the "only means" for the States to remedy noncompliance with that Act by federal facilities. *Han-*

*cock v. Train,* 426 U.S. 167, 196, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976). In a sister case decided the same day, *EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), the Supreme Court's discussion of § 505 of the Water Pollution Amendments implicitly assumes that its language likewise defines the sole means by which a State may remedy federal non-compliance with the Water Pollution Control Act.

■ The United States maintains that in light of these interpretations of the Clean Air and the Water Pollution Control Acts, the only permissible avenue of enforcement against Chamberlain was a civil action filed in a United States District Court. The contention has merit only if Chamberlain is a "department, agency, or instrumentality of the executive, legislative, [or] judicial [branch] of the Federal Government . . . ." See 33 U.S.C. § 1323. The Court is of the view that it is not. Although the Government rests its case squarely on the Supreme Court analysis of the jurisdictional limitations imposed by the Water Pollution Control Act, an evaluation of Chamberlain's situation absent the statute lends perspective to the issue before this Court.

■ The Water Act does not purport to create immunities from suit for violations of State effluent standards where none existed before its enactment. Such an interpretation, affording increased protection to polluters, in addition to being of dubious Constitutional validity, would fly directly in the face of the Act's purpose. Consequently, if prior to the creation of the Water Act, Chamberlain enjoyed no immunity from this type of suit as a fringe benefit of its relationship with the Government, it can find no impregnable haven in the statute, even though the question of where it may be made to stand trial could be affected.

■ The Federal Government's immunity from suit emanates from the Constitution by implication. *Keifer & Keifer v. Reconstruction Finance Corporation,* 306 U.S. 381, 388–389, 59 S.Ct. 516, 83 L.Ed. 784 (1939);

*Monaco v. Mississippi,* 292 U.S. 313, 321, 54 S.Ct. 745, 78 L.Ed. 1282 (1934). Because the doctrine places the United States in a privileged position, it has been "appropriately confined" and the Government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work. *Ibid: Sloan Shipyards v. United States Fleet Corporation,* 258 U.S. 549, 567, 42 S.Ct. 386, 66 L.Ed. 762 (1922). Nothing in the relationship between Chamberlain and the Government in this case requires an exception to this general principle.

Exhibit 1 to the Government's brief in support of its motion for summary judgment refers to the companies which were operating ammunition plants under an agreement with the United States in 1972 as "independent contractors". Likewise, the two contracts which bridge the time span pertinent to this suit denominate Chamberlain "an independent contractor and not an agency of the Government" and employ language fully consistent with that characterization. To cloak Chamberlain with the immunity of the Government under these circumstances would violate the principle of restrictive application enunciated in *Keifer & Keifer.* Accordingly, in two cases arising out of the same incident at an ammunition plant listed in Government Exhibit 1, the Fifth and Eighth Circuits declined to extend immunity to the contractor despite its intimate connection with the United States. *Whitaker v. Harvell-Kilgore Corporation,* 418 F.2d 1010 (5th Cir. 1969) and *Foster v. Day and Zimmermann, Inc.,* 502 F.2d 867 (8th Cir. 1974). In concluding that the defendant manufacturer did not enjoy any governmental immunity, *Whitaker* and *Foster* relied on the Supreme Court's view that these ammunition plants are "private". See *Powell v. United States Cartridge Company,* 339 U.S. 497, 507, 70 S.Ct. 755, 94 L.Ed. 1017 (1950). Given the near identity of Chamberlain's position in this matter to that of the analogous company in *Whitaker* and *Foster,* the Court perceives no material factual distinction which would render those cases inapposite here. Since the Court concurs in the legal analysis

of the Fifth and Eighth Circuits, it likewise is of the view that prior to the enactment of the Water Pollution Control Act, Chamberlain enjoyed no immunity which it could interpose between itself and the Board. The fact that the latter of Chamberlain's two relevant contracts contains an indemnity clause only reinforces this conclusion.

■ Since Chamberlain had no immunity prior to the Water Act Amendments and since they created no immunities where none previously existed, the Board's action is invalid only if it was required to vindicate its effluent standards by a civil action in a United States District Court. However, such a limitation on a State's enforcement options applies only where the polluting activities of a Government "department, agency, or instrumentality" are under attack. To include Chamberlain, an independent contractor, within that definition would not only strain the literal language, but would, by extending a partial shield to the vast number of companies which do business under contract with the Government, flout the environmental concerns which gave impetus to the Air and Water Acts. Those statutes, rather than erecting new obstacles to enforcement, exposed to suit in a specific forum the otherwise immune activities of strictly governmental agencies. That companies such as Chamberlain were not meant to be encompassed within their exclusive remedy provisions is evidenced by the Supreme Court's discussion of the Clean Air Act in the context of Congress's ". . . exclusive legislative authority over *federal enclaves purchased with the consent of a State . . .*"—a description of the facilities affected by the Act into which Chamberlain does not fit. *Hancock v. Train,* 426 U.S. 167, 178, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976).

■ This Court's refusal to invalidate the Board's penalty against Chamberlain does not undo the restrictions placed on a State's enforcement of its pollution standards by *Train* and *EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

Federal buildings and installations operated directly by the Government, such as penitentiaries, army bases, post offices, courthouses and the like were the intended objects of the Air and Water Acts' limited waiver of immunity and are the facilities to which they speak. In the final analysis, those Acts have no bearing on the Board's action against Chamberlain.

In the light of the foregoing, an appropriate order directing entry of judgment in favor of the Board will issue.