ROGERS, Circuit Judge,
concurring.
The text of the Petition Clause of the First Amendment does not explicitly indicate whether the right to petition includes a right to a response. Appellants ask the court to consider the text in light of historical evidence of how the right to petition was understood at the time the First Amendment was adopted. Essentially, they contend that the Petition Clause should be read in light of contemporary understanding, which they suggest indicates that the obligation to respond was part and parcel of the right to petition.
As the court points out, we have no occasion to resolve the merits of appellants’ historical argument, given the binding Supreme Court precedent in Smith v. Arkansas State Highway Employees, 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979), and Minnesota State Board for Community Colleges v. Knight, 465 U.S. 271, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984). Op. at 144. That precedent, however, does not refer to the historical evidence and we know from the briefs in Knight that the historical argument was not presented to the Supreme Court.
The Supreme Court’s interpretation of the Constitution has been informed by the understanding that:
“The provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil. Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth.”
Konigsberg v. State Bar of California, 366 U.S. 36, 50 n. 10, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961) (quoting Gompers v. United States, 233 U.S. 604, 610, 34 S.Ct. 693, 58 L.Ed. 1115 (1914)). Even where the plain text yields a clear interpretation, the Supreme Court has rejected a pure textualist approach in favor of an analysis that accords weight to the historical context and the underlying purpose of the clause at issue. For example, in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Supreme Court stated that “[t]he history may help explain why the Court consistently has declined to take a rigid, absolutist view of the Establishment Clause. We have refused ‘to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history.’ ” Id. at 678, 104 S.Ct. 1355 (quoting Walz v. Tax Comm’n, 397 U.S. 664, 671, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)); see id. at 673-75, 90 S.Ct. 1409. Nor is the Supreme Court’s rejection of literalism limited to the First Amendment.[1]
*146 In the context of the First Amendment, the Supreme Court has repeatedly emphasized the significance of historical evidence. A few examples suffice to illustrate the point. In Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the Supreme Court acknowledged that:
[The] right of access to criminal trials [by the press] is not explicitly mentioned in terms in the First Amendment. But we have long eschewed any narrow, literal conception of the Amendment’s terms, for the Framers were concerned with broad principles, and wrote against a background of shared values and practices. The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights.
Id. at 604, 102 S.Ct. 2613 (internal quotations marks omitted) (citations omitted). In Lynch v. Donnelly, the Supreme Court acknowledged that its “interpretation of the Establishment Clause has comported with what history reveals was the contemporaneous understanding of its guarantees.” 465 U.S. at 673, 104 S.Ct. 1355; see id. at 673-77, 104 S.Ct. 1355. In Marsh v. Chambers, 463 U.S. 783, 786-94, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the Supreme Court looked to contemporary practice from the early sessions of Congress and to later congressional practice in holding that paid legislative chaplains and opening prayers do not violate the First Amendment. See Minneapolis Star & Tribune Co. v. Minn. Comm’r of Revenue, 460 U.S. 575, 583-85, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983); Engel v. Vitale, 370 U.S. 421, 425- *147 33, 82. S.Ct. 1261, 8 L.Ed.2d 601 (1962); Everson v. Bd. of Educ., 330 U.S. 1, 7-15, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Grosjean v. Am. Press Co., 297 U.S. 233, 240, 245-49, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Near v. Minnesota, 283 U.S. 697, 713-18, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).[2]
Appellants point to the long history of petitioning and the importance of the practice in England, the American Colonies, and the United States until the 1830’s as suggesting that the right to petition was commonly understood at the time the First Amendment was proposed and ratified to include duties of consideration and response. See Julie M. Spanbauer, The First Amendment Right to Petition Government for a Redress of Grievances: Cut From a Different Cloth, 21 Hastings Const. L.Q. 15, 22-38 (1993); Norman B. Smith, “Shall Make No Law Abridging ... An Analysis of the Neglected, but Nearly Absolute, Right of Petition, 54 U. Cin. L. Rev. 1153, 1154-68, 1170-75 (1986). Based on the historical background of the Petition Clause, “most scholars agree that the right to petition includes a right to some sort of considered response.” James E. Pfander, Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Ptursue Judicial Claims Against the Government, 91 Nw. U.L. Rev. 899, 905 n. 22 (1997); see David C. Frederick, John Quincy Adams, Slavery, and the Right of Petition, 9 Law & Hist. L. Rev. 113, 141 (1991); Spanbauer, supra, at 40-42; Stephen A. Higginson, Note, A Short History of the Right to Petition, 96 Yale L.J. 142, 155-56 (1986); Note, A Petition Clause Analysis of Suits Against the Government: Implications for Rule 11 Sanctions, 106 Harv. L. Rev. 1111, 1116-17, 1119-20 (1993); see also Akhil Reed Amar, The Bill of Rights as a Constitution, 100 Yale L.J. 1131, 1156 (1991) (lending credence to Higginson’s argument that the Petition Clause implies a duty to respond). Even those who take a different view, based on a redefinition of the question and differences between English and American governments, acknowledge that there is “an emerging consensus of scholars” embracing appellants’ interpretation of the right to petition. See Gary Lawson & Guy Seidman, Downsizing the Right to Petition, 93 Nw. U.L. Rev. 739, 756 (1999).
The sources cited by appellants indicate that “[t]he debates over the inclusion of the right to petition reveal very little about why the convention delegates may have regarded the right as important or what the ‘framers’ intended with respect to the substantive meaning of the right.” Frederick, supra, at 117 n. 19 (citing 4 BERNARD Schwartz, The Roots Of The Bill Of Rights 762-66, 84(M2 (1980)); see Higgin-son, supra, at 155-56. But neither textual omission[3] nor the absence of explicit state *148 ments by Framers or Ratifiers on the precise issue has been dispositive in the Supreme Court’s First Amendment jurisprudence. Instead, the historical context and the underlying purpose have been the hallmarks of the Supreme Court’s approach to the First Amendment. See, e.g., Buckley v. Valeo, 424 U.S. 1, 14-15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); New York Times Co. v. Sullivan, 376 U.S. 254, 269-71, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Roth v. United States, 354 U.S. 476, 481-84, 488, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Beauharnais v. Illinois, 343 U.S. 250, 254-55, 72 S.Ct. 725, 96 L.Ed. 919 (1952).
The Supreme Court’s free speech precedent is illustrative. Although the textual meaning of “speech” is as clear, in terms of dictionary definitions, as the meaning of “petition,” the’ Supreme Court has interpreted “speech” broadly in order to protect freedom of expression:
The First Amendment literally forbids the abridgment only of “speech,” but we have long recognized that its protection does not end at the spoken or written word .... [W]e have acknowledged that conduct may be “sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.”
Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (quoting Spence v. Washington, 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)); cf. NAACP v. Button, 371 U.S. 415, 430, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The text of the First Amendment mentions neither writing nor conduct, and at the time of the Founding, as now, the word “speech” meant expression through “vocal words.”[4] Yet the Supreme Court has considered both the history and purpose of the First Amendment in according a broad interpretation to the Free Speech Clause. Looking, in part, to the Framers’ intent, the Supreme Court has held that the Free *149 Speech Clause applies to written communications, see City of Ladue v. Gilleo, 512 U.S. 43, 45, 58, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994); Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 61, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); Martin v. Struthers, 319 U.S. 141, 141-42, 149, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), as well as a broad range of expressive activities, including spending to promote a cause, First Nat’l Bank v. Bellotti, 435 U.S. 765, 767, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); Buckley, 424 U.S. at 19-20, 96 S.Ct. 612, burning the American flag, see Johnson, 491 U.S. at 399-400, 404-06, 109 S.Ct. 2533, and dancing nude, see City of Erie v. Pap’s A.M., 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); Barnes v. Glen Theatre, Inc., 501 U.S. 560, 565-66, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Furthermore, although the dictionaries do not exclude any particular types of oral communication from the definition of “speech,” the Supreme Court has held, in light of the historical context, that the First Amendment does not protect obscene speech, Roth, 354 U.S. at 481-85, 488, 77 S.Ct. 1304; Miller v. California, 413 U.S. 15, 23, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), libelous speech, Beauharnais, 343 U.S. at 254-55, 266, 72 S.Ct. 725, false commercial speech, see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n, 447 U.S. 557, 563-64, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. 748, 771-72, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), or speech that is “likely to cause a breach of the peace,” Chaplinsky v. New Hampshire, 315 U.S. 568, 569, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).
Of course, this court cannot know whether the traditional historical analysis would have resonance with the Supreme Court in a Petition Clause claim such as appellants have brought. It remains to be seen whether the Supreme Court would agree to entertain the issue, much less whether it would agree with appellants and “most scholars” that the historical evidence provides insight into the First Congress’s understanding of what was meant by the right to petition and reevaluate its precedent, or conversely reject that analysis in light of other considerations, such as the nature of our constitutional government. No doubt it would present an interesting question. For now it suffices to observe that appellants’ emphasis on contemporary historical understanding and practices is consistent with the Supreme Court’s traditional interpretative approach to the First Amendment.

. For instance, in Eleventh Amendment cases, the Supreme Court has rejected “ahistorical literalism,” Alden v. Maine, 527 U.S. 706, 730, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), and instead has turned to "history, practice, precedent, and the structure of the Constitution,” id. at 741, 119 S.Ct. 2240; see id. at 711-24, 730-35, 741-44, 119 S.Ct. 2240, explaining that "[a]lthough the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, ‘we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms,' " id. at 729, 119 S.Ct. 2240 (omission in original) (quoting Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991))); see also Seminole Tribe, 517 U.S. at 69-70, 116 S.Ct. 1114; Principality of Monaco v. Mississippi, 292 *146 U.S. 313, 320-26, 330, 54 S.Ct. 745, 78 L.Ed. 1282 (1934); Hans v. Louisiana, 134 U.S. 1, 10-11, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). In construing the Fifth Amendment in Ullmann v. United States, 350 U.S. 422, 424-25, 438-39, 76 S.Ct. 497, 100 L.Ed. 511 (1956), the Supreme Court rejected the contention that the privilege against self-incrimination protects an individual who is given immunity from prosecution from being forced to testify before a grand jury. For "the privilege against self-incrimination[,] ... it is peculiarly true that 'a page of history is worth a volume of logic.’ For the history of the privilege establishes not only that it is not to be interpreted literally, but also that its sole concern is ... with the danger to a witness forced to give testimony” that may lead to criminal charges. Id. at 438-39, 76 S.Ct. 497 (internal quotation marks omitted) (citations omitted) (quoting New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921)). And in interpreting the Ex Post Facto Clause, the Supreme Court in Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), relied on history rather than adopting a literal construction:
Although the Latin phrase "ex post facto " literally encompasses any law passed "after the fact,” it has long been recognized by this Court that the constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them. As early opinions in this Court explained, "ex post facto law” was a term of art with an established meaning at the time of the framing of the Constitution.
Id. at 41, 110 S.Ct. 2715 (internal citations omitted) (citing Calder v. Bull, 3 Dall. 386, 1 L.Ed. 648 (1798)); see Minnesota v. Carter, 525 U.S. 83, 88-89, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); Maryland v. Craig, 497 U.S. 836, 844-49, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 502-03, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); Goldstein v. California, 412 U.S. 546, 561-62, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973); Gravel v. United States, 408 U.S. 606, 616-18, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); Wright v. United States, 302 U.S. 583, 607, 58 S.Ct. 395, 82 L.Ed. 439 (1938) (Stone, J., concurring); Olmstead v. United States, 277 U.S. 438, 476-77, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting); Boyd v. United States, 116 U.S. 616, 634-35, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

. Similar analysis is found in the Supreme Court's interpretation of other provisions of the Constitution. See Crawford v. Washington, 541 U.S. 36, 42-50, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (Sixth Amendment); Atwater v. City of Lago Vista, 532 U.S. 318, 326-40, 345 n. 14, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (Fourth Amendment); U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 782-83, 800-15, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Tenth Amendment); Harmelin v. Michigan, 501 U.S. 957, 975-85, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Eighth Amendment); Wesberry v. Sanders, 376 U.S. 1, 2-3, 7-17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (Art. I, § 2).

. See, e.g., Globe Newspaper, 457 U.S. at 604, 102 S.Ct. 2613. The Supreme Court has adopted the same approach in interpreting other provisions of the Constitution. For ex- . ample, in holding that the Speech or Debate Clause applies to a Senator's aide even though it mentions only “Senators and Representatives,” the Supreme Court in Gravel observed that although the Clause “speaks only of 'Speech or Debate,’ " its precedent, consistent with adhering to the underlying purpose of the Clause, “ha[d] plainly not taken a liter *148 alistic approach in applying the privilege” to protect committee reports, resolutions, and voting. Gravel, 408 U.S. at 617, 92 S.Ct. 2614; see id. at 616-18, 92 S.Ct. 2614. In the Fourth Amendment context, although the Amendment speaks only to protecting people in their houses, the Supreme Court in Carter noted that its precedent, in some situations, had extended that protection to apply to individuals' privacy in other people's houses. Carter, 525 U.S. at 88-89, 119 S.Ct. 469; see also Faretta v. California, 422 U.S. 806, 819 & n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); Goldstein, 412 U.S. at 561-62, 93 S.Ct. 2303; Principality of Monaco, 292 U.S. at 320-23, 330, 54 S.Ct. 745; Hans, 134 U.S. at 10-11, 15, 10 S.Ct. 504.

. 2 Samuel Johnson, A Dictionary Of The English Language (6th ed. 1785) (''speech”: “The power of articulate utterance; the power of expressing thoughts by vocal words,” "Language; words considered as expressing thoughts,” "Particular language; as distinct from others,” "Any thing spoken,” “Talk; mention,” "Oration, harangue,” "Declaration of thoughts”); 2 Thomas Sheridan, A Complete Dictionary Of The English Language (3d ed. 1790) ("speech”: "The power of articulate utterance, the power of expressing thoughts by vocal words; language, words considered as expressing thoughts; particular language as distinct from others; any thing spoken; talk, mention; oration, harangue”); see Nathan Bailey, An Universal Etymological English Dictionary (24th ed. 1782) ("speech”: “Language, Discourse”); see also The American Heritage Dictionary Of The English Language 1731 (3d ed.1992) ("speech”: "The faculty or act of speaking,” "The faculty or act of expressing or describing thoughts, feelings, or perceptions by the articulation of words,” "Something spoken; an utterance,” "Vocal communication; conversation”); The New Oxford American Dictionary 1630 (2d ed.2005) ("speech”: "the expression of or the ability to express thoughts and feelings by articulate sounds”); 16 The Oxford English Dictionary 175-77 (2d ed.1989) ("speech”: "The act of speaking; the natural exercise of the vocal organs; the utterance of words or sentences; oral expression of thought or feeling”).