Everett MENDELSOHN, Riyad H. Mansour, Nubar Hovsepian, Ibrahim Abu-Lughod, Victor A. Ajlouny, et al., Plaintiffs,

v.

Edwin MEESE, III, Attorney General of the United States, Defendant.

No. 88 Civ. 2005 (ELP).

United States District Court, S.D. New York.

June 29, 1988.

Rudolph W. Giuliani, U.S. Atty., Richard W. Mark, Asst. U.S. Atty., S.D.N.Y., New York City, John R. Bolton, Asst. Atty. Gen., Mona Butler, David J. Anderson, Vincent M. Garvey, U.S. Dept. of Justice, Civil Div., Washington, D.C., for Atty. Gen.

Leonard B. Boudin, Michael Krinsky, David Golove, Nicholas E. Poser, David B. Goldstein, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, for plaintiffs Mendelsohn, et al.

## ORDER AND OPINION

PALMIERI, District Judge:

This action for a declaratory judgment, 28 U.S.C. §§ 2201–2202 (1982), is an attack by sixty five United States citizens and organizations on the constitutionality of the Anti–Terrorism Act of 1987[1] (the "ATA"). The ATA is discussed extensively in this court's opinion in *United States v. PLO*, 695 F.Supp. 1456 (S.D.N.Y.1988), which is filed herewith. Familiarity with that opinion is assumed. Commenced March 23, 1988, two days after the ATA became effective,[2] this action contains two claims for relief. The first, asserted by Riyad H. Mansour, challenges the applicability of the ATA to the Permanent Observer Mission of the Palestine Liberation Organization to the United States (the "Mission"), and, in the alternative, attacks the ATA's constitutionality if it is applicable to the Mission. Mansour is a party to *United States v. PLO, ante,* because he is a member of the Mission.

The plaintiffs' second claim seeks a declaratory judgment that the ATA violates their rights of free speech and association guaranteed by the First Amendment to the Constitution, as well as the Constitution's prohibition of Bills of Attainder.

**1.** Title X of the Foreign Relations Authorization Act for Fiscal Years 1988–89. Pub.L. 100–204, §§ 1001–1005, 101 Stat. 1331, 1406–07; 22 U.S.C.A. §§ 5201–5203 (West Supp. 1988).

**2.** Pub.L. 100–204, Title X, § 1005(a), 101 Stat. 1331, 1407, *set out in* 22 U.S.C.A. § 5201 note (West Supp. 1988).

## I

### Background

The ATA is aimed explicitly at the Palestine Liberation Organization (the "PLO").[3] Congress has declared that the PLO is "a terrorist organization and a threat to the interests of the United States, its allies, and to international law and should not benefit from operating in the United States." 22 U.S.C. § 5201(b). The ATA, on its face, seriously curbs the operations of the PLO in the United States. We have today construed the ATA to be inapplicable to the PLO's Permanent Observer Mission to the United Nations in order to avoid conflict with an international obligation of the United States. *United States v. PLO, ante.* Nonetheless, there remains the question whether the ATA violates certain constitutional rights.

The ATA prohibits, with the purpose of furthering the interests of the PLO: (1) receiving "anything of value except informational material from the PLO;" (2) expending funds from the PLO; and (3) establishing or maintaining "an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by" the PLO. 22 U.S.C. § 5202.

There are four plaintiffs who have alleged, with supporting affidavits, that they wish to undertake certain activities but have not yet done so for fear of prosecution under the ATA.

Ibrahim Abu–Lughod, a United States citizen, is Chairman of the Political Science Department at Northwestern University in Evanston, Illinois. He asserts that he as been asked to attend various meetings throughout the United States to explain the position and views of the PLO on the current situation in the Middle East but is unable to do so unless his travel expenses

**3.** By referring to the PLO, the court refers to "the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof." 22 U.S.C. § 5202. The "agent" aspect of this definition is limited by our discussion in Part III, *infra.*

are reimbursed by the PLO. Victor A. Ajlouny, also a United States citizen, similarly declares that the Palestine Red Crescent Society, a constituent group of the PLO, has requested that he undertake a series of speaking engagements in the United States with its funds. He, too, declares he is unable to do so unless his travel expenses are paid. Lughod and Ajlouny therefore present the same claim—that the ATA impermissibly forecloses their right to solicit and receive funds from the PLO in order to facilitate the exchange of views and information.

Nubar Hovsepian, also a United States citizen, asserts that the PLO has requested that he establish and maintain an office in the United States to gather, write and disseminate materials on the subject of the Palestinian people. He also declares that the PLO has requested him to arrange, through that office, for speakers and forums in which these subjects will be discussed. He has sworn that he is prepared to open the office immediately, has laid out his initial plans for the office's undertakings and has received a commitment from individuals for the necessary funding, contingent only on a determination that it would be lawful under the ATA to open the office. According to Hovsepian, "this office will not be authorized to present official views and positions of the PLO, to speak on behalf of the PLO or to represent the PLO." Declaration of Nubar Hovsepian, sworn to March 15, 1988, ¶ 13. His proposed office comes within the literal prohibitions of the ATA—he will establish it "at the behest of" the PLO and with the purpose of "further[ing] the interests of" the PLO. 22 U.S.C. § 5202(3).

Riyad H. Mansour, a United States citizen who is employed as Deputy Permanent Observer at the PLO mission, asserts that various constitutional infirmities require the ATA to be struck down. In light of this court's construction of the ATA in *United States v. PLO, ante,* only some of Mansour's claims of unconstitutionality need be reached.

The various other plaintiffs present claims that the ATA violates their rights to receive information and to engage in face to face dialogue. *Lamont v. Postmaster General,* 381 U.S. 301, 307, 85 S.Ct. 1493, 1496, 14 L.Ed.2d 398 (1965); *see Kleindienst v. Mandel,* 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972). But for the ATA, they allegedly would receive information from Hovsepian's office and would engage in face to face dialogue with Lughod and Ajlouny.

## II

### Standing

It is axiomatic that "at an irreducible minimum, Article III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), and that the injury 'fairly can be traced to the challenged action' and is 'likely to be redressed by a favorable decision,' *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1925, 48 L.Ed.2d 450] (1976)." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote omitted).

The Attorney General argues that three of the individual "speaking" plaintiffs—Lughod, Ajlouny and Hovsepian—do not have standing because the government is "not now taking any steps to enforce the ATA outside of the PLO Observer Mission context." There is no question that, like the plaintiffs in *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974), and *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 301–03, 99 S.Ct. 2301, 2310–11, 60 L.Ed.2d 895 (1979), these plaintiffs have alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt,* 442 U.S. at 298, 99 S.Ct. at 2309. The government asserts, though, that their claims present no more than a speculative and anticipatory challenge to the statute,

1478

analogous to the one rejected by the Eleventh Circuit in *Hardwick v. Bowers,* 760 F.2d 1202, 1206–07 (11th Cir.1985), *rev'd,* 478 U.S. 186, 189, 106 S.Ct. 2841, 2842, 92 L.Ed.2d 140 (1986). Some of the plaintiffs in that case alleged a desire to engage in future conduct which was, on its face, a violation of a state sodomy statute. They claimed "only that the *existence* of the statute along with the arrest of Hardwick [a homosexual] had 'chilled and deterred' them and had 'interfered' with decisions regarding their private lives." *Id.,* 760 F.2d at 1206 (emphasis supplied). It was their objection to the statute's mere existence which was at the heart of the circuit court's decision that the threat of enforcement against them was merely speculative. We believe this case, in contrast, presents the plaintiffs with a sufficiently concrete threat of prosecution to require a determination of their claims. The Attorney General is at this point going forward with an enforcement action based on the ATA against persons, who, like these plaintiffs, have indicated a desire to further the interests of the PLO. In contrast, the statute in *Hardwick* had not been enforced for many years against heterosexuals who had engaged in sodomy, but had been enforced against a homosexual. The Attorney General has refused to stipulate that any actions taken by the plaintiffs during the pendency of this lawsuit would be protected from enforcement in the event the statute survives an initial attack,[4] or to allay the plaintiffs' fears of prosecution by making a determination that they will not in fact be prosecuted. The Attorney General has therefore assumed an aggressive litigating posture vis-a-vis these very individuals. The Attorney General's own position in this lawsuit and its companion, *United States v. PLO,* leave this court with no doubt that there exists a "credible threat of prosecution." *See Virginia v. American Booksellers Association, Inc.,* —— U.S. ——, 108 S.Ct. 636, 642, 98 L.E.2d 782, 794 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State

has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that the plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them."); *Babbitt, supra,* 442 U.S. at 302, 99 S.Ct. at 2310.

We find unpersuasive the government's argument that these plaintiffs' injuries are not capable of judicial redress because their claim is contingent on the willingness of third parties to provide funding. On cross-motions for summary judgment, we have no choice but to accept the uncontradicted affidavit stating that the funding commitment is firm. Fed R.Civ.P. 56(c); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). In addition, the threatened prosecution would leave the plaintiffs unable to compete for funding from the PLO. 22 U.S.C. § 5202(1). "Opening the door to the possibility of obtaining sought after benefits is sufficient to satisfy the redress requirement." *Bullfrog Films, Inc. v. Wick,* 847 F.2d 502, 507 (9th Cir.1988) (*citing Regents of University of California v. Bakke,* 438 U.S. 265, 280–81 n. 14, 98 S.Ct. 2733, 2742–43 n. 14, 57 L.Ed.2d 750 (1978)). The government's request for discovery in hopes of discrediting the assertion that funds have been committed is therefore not only too late, but also irrelevant, and is denied.

■ The government argues that the remaining plaintiffs, who allege that their "listening" rights under the First Amendment are abridged by the ATA, do not have standing. We agree. Their grievance is, in many ways, common to all United States citizens. We also believe their reliance on *Kleindienst v. Mandel, supra,* is not entirely apt. In *Mandel,* the Supreme Court upheld the denial of an alien's application for a visa to enter the United States. While most of the plaintiffs in that case were United States citizens deprived of the "particular qualities inherent in sustained,

---

**4.** The Attorney General may seek injunctions and "other equitable relief." 22 U.S.C. § 5203(b). Thus the plaintiffs could be forced

to disgorge any money they receive from the PLO during the pendency of this action.

face-to-face debate, discussion and questioning," *id.* 408 U.S. at 765, 92 S.Ct. at 2583, Mandel himself was also a plaintiff. The fact that a person has a First Amendment interest does not require a finding that he has standing. Often the right to receive information will be common to all citizens and will not give a litigant a sufficient personal stake in the outcome of a case to sustain a finding of standing. *See, e.g., American Booksellers Association v. Strobel,* 617 F.Supp. 699, 704 (E.D.Va. 1985), *aff'd* 802 F.2d 691 (4th Cir.1986), *questions of state law certified, Virginia v. American Booksellers Association, supra,* —— U.S. at —— n. 3, 108 S.Ct. at 640 n. 3, 98 L.E.2d at 791 n. 3.[5] It is for that reason that, in the First Amendment context, litigants are "permitted to challenge a statute not because their own rights of free speech are violated but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Indeed, in this case, other litigants raise the issues raised by these plaintiffs. A consideration of the benefits which would accrue to the "listening" plaintiffs by the activities of the "speaking" plaintiffs is necessary in considering the First Amendment claims of the "speaking" plaintiffs. The "listening" plaintiffs' participation in the lawsuit is therefore unnecessary to a determination of these issues.

### III

#### *First Amendment Claims*

A. First Amendment Interests.

■ At the outset, the court is unpersuaded by the government's argument that

no First Amendment interests are implicated here. It is true that the ATA on its face does not purport to "prohibit, edit or restrain" speech or advocacy. *See .Meese v. Keene,* 481 U.S. 465, ——, 107 S.Ct. 1862, 1871, 95 L.E.2d 415, 428 (1987). And it is true that the plaintiffs remain free to say anything they like about the PLO and to spend as much of their own money as they wish doing so. Nonetheless, important First Amendment interests are implicated here. The First Amendment embodies our "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). This requires special protection of communication relating to political affairs. *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982). The exchange of ideas about the political issues relating to the PLO is necessarily less robust because of the existence of the ATA. For instance, Lughod and Ajlouny, unable to travel with funds provided by the PLO, will not be as able to communicate with other academics as they would be had the ATA not been passed. In addition, the ATA effectively deprives Lughod and Ajlouny of the chance to solicit PLO funds. While the rights to solicit and expend funds are not absolute, the obstruction by the government of their exercise necessitates a First Amendment analysis. *Meyer v. Grant,* —— U.S. ——, 108 S.Ct. 1886, 1889–95, 100 L.Ed.2d 425 (1988) (state law prohibiting payment to petition circulators implicates First Amendment interests of volunteer petition circulator); *Village of Schaumburg v. Citizens*

---

5. We believe the findings of standing in *Allende v. Shultz,* 605 F.Supp. 1220, 1222–23 (D.Mass. 1985), *related opin. aff'd,* 845 F.2d 1111, 1116 (1st Cir.1988), and *Abourezk v. Reagan,* 592 F.Supp. 880, 883–84 n. 10 (D.D.C.1984), *vacated,* 785 F.2d 1043, 1050 (D.C.Cir.1986), *aff'd by an equally divided court,* —— U.S. ——, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987), are unpersuasive. The excluded aliens in those cases, as in *Mandel,* upon which they rely, were in fact plaintiffs. It was the excluded aliens who suffered an injury in fact and had a personal stake in the outcome of the litigation. The fact that they did not have meritorious claims does not speak to the question of their standing. The discussion of standing in those cases does not take sufficient account of a legitimate and necessary differentiation between a First Amendment interest in receiving information on the one hand, and a *personal* stake in the outcome of a litigation on the other. For that reason, we find the decision in *American Booksellers* compelling.

*for a Better Environment,* 444 U.S. 620, 628–32, 100 S.Ct. 826, 831–33, 63 L.Ed.2d 73 (1980) (door to door charitable solicitation); *Buckley v. Valeo,* 424 U.S. 1, 24–26, 96 S.Ct. 612, 637–38, 46 L.Ed.2d 659 (1976) (election campaign contribution limits); *see Bates v. State Bar of Arizona,* 433 U.S. 350, 363, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977) (speech is protected even when it is "in the form of a solicitation to pay or contribute money"). Also, the interest of Lughod and Ajlouny's audience in "sustained, face-to-face debate, discussion and questioning" raises First Amendment concerns. *Mandel* 408 U.S. at 765, 92 S.Ct. at 2583. The fact that Lughod and Ajlouny "remain free to employ other means to disseminate their ideas does not take their speech ... outside the bounds of First Amendment protection.... That [the statute] leaves open 'more burdensome' avenues of communication does not relieve its burden on First Amendment expression." *Meyer v. Grant, supra,* 108 S.Ct. at 1891–93 (*citing FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986)).

In addition, Hovsepian's ability to maintain an office through which to deliver his message is affected by the ATA. Again, it is true that he has other means of speaking besides maintaining an office at the request of the PLO. But to say that these alternatives preclude First Amendment analysis would be tantamount to saying he has no interest in *effective* advocacy in this regard. Without freedom of association, political advocacy as we know it would be impossible. *See Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 296, 299, 102 S.Ct. 434, 437, 439, 70 L.Ed.2d 492 (1981); *Buckley v. Valeo, supra,* 424 U.S. at 15, 96 S.Ct. at 632 ("effective advocacy of both public and private points of view is undeniably enhanced by group association") (*quoting NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958)). And the right of association would be meaningless without the prospect of organization made possible by maintaining an office. This is not to

say that these rights are absolute, or even that Hovsepian's proposed behavior is or is not in fact protected by the First Amendment, but only that scrutiny under traditional analysis applied to First Amendment interests is required. *See* Parts III(B) & (C), *infra.*

■ The government asserts that because the plaintiffs would be acting at the behest of the PLO and accepting money from the PLO they are agents of a foreign power with no constitutional rights. There is strong support for the general proposition that constitutional rights can rarely, if ever, be invoked in the face of combined executive and legislative action in the field of foreign affairs. *See Goldwater v. Carter,* 444 U.S. 996, 997, 997–98, 100 S.Ct. 533, 533, 533–34, 62 L.Ed.2d 428 (1979) (statement of Justice Powell); *id.,* 444 U.S. at 1002, 1004 & n. 1, 100 S.Ct. at 536, 537 & n. 1 (statement of Justice Rehnquist); *cf. Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 634, 635–37, 72 S.Ct. 863, 869, 870–71, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). This proposition, like many of the most fundamental constitutional principles, "is reached not fundamentally on the basis of ... textual exegesis ... but on the basis of the total structure which the text has created." C. Black, *Structure and Relationship in Constitutional Law* 15 (1969). "The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context." *Youngstown Sheet & Tube, supra,* 343 U.S. at 634, 635, 72 S.Ct. at 869, 870 (Jackson, J., concurring).

The opinion of Chief Justice Marshall in *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 136–46, 3 L.Ed. 287 (1812), which established the principles of sovereign immunity in United States courts before the enactment of the Foreign Sovereign Immunities Act,[6] casts light on these principles. The Chief Justice, relying on the fact that one sovereign is "in no respect amenable to another," *id.* at 136, held foreign sovereigns immune from suit in

6. Pub.L. 94–583, 90 Stat. 2891 (codified at 28 U.S.C. §§ 1602–1611 (1982)).

United States courts. His argument derived not from any limitation imposed by the text of the Constitution, but from the relationship between the Constitution and the sovereign. A "foreign state lies outside the structure of the Union." *Principality of Monaco v. Mississippi*, 292 U.S. 313, 330, 54 S.Ct. 745, 751, 78 L.Ed. 1282 (1934). The same is true of the PLO, an organization whose status, while uncertain, lies outside the constitutional system. It has never undertaken to abide by United States law or to "accept the constitutional plan." *Ibid.* No foreign entity of its nature could be expected to do so.

These principles, deriving from the relationship of foreign entities to the constitutional structure, provide important guidance in this context. As Professor Damrosch has said, "in addition to the usual reluctance of courts to intrude into matters of foreign policy, there are special considerations inherent in the nature of foreign sovereignty and the relationship of foreign sovereigns to the constitutional structure...." Damrosch, *Foreign States and the Constitution*, 73 Va.L.Rev. 483, 518 (1987). It would make no sense to allow American citizens to invoke their constitutional rights in an effort to act as official representatives of foreign powers upon which the political branches have placed limits. Doing so would severely hamper the ability of the political branches to conduct foreign affairs. Any action harming the interests of a foreign power could otherwise be challenged in court as a violation of Americans' due process or First Amendment rights.[7] Diplomatic relations could not be severed, for the foreign government could enlist American citizens to act as its representatives.

■ Nonetheless, the proposition that the Constitution cannot be invoked to protect speech by an American citizen acting as an official representative of the PLO disposes of only one of the claims before the court. Three speaking plaintiffs explicitly deny acting in any sort of official capacity at all. Only Mansour's First Amendment claims are barred, for only Mansour acts as an official of the PLO. We cannot extend the government's argument to reach the others. The line between an official representative of a foreign entity and an agent, "dominated" and "controlled" by a foreign power is one we cannot cross, under *Communist Party v. Subversive Activities Control Board*, 367 U.S. 1, 95–96, 81 S.Ct. 1357, 1410, 6 L.Ed.2d 625 (1961) (hereinafter *"S.A.C.B."*)

■ As Justice Frankfurter recognized in *S.A.C.B.*, although the "[m]eans for effective resistance against foreign incursion ... may not be denied to the national legislature ... congressional power in this sphere, as in all spheres, is limited by the First Amendment. Individual liberties fundamental to American institutions are not to be destroyed under pretext of preserving those institutions, even from the gravest external dangers." *Ibid.* We cannot agree with the Attorney General that by associating with or accepting money from the PLO, these American citizens are put in the same relationship to the Constitution as the PLO itself. If that were true, the court's opinion in *S.A.C.B.* would have been unnecessary. The Control Board explicitly found that the Communist Party members were "agents" of Soviet Russia, completely, indeed "ruthlessly" dominated and controlled. *Id.*, 367 U.S. at 42–54, 81 S.Ct. at 1382–88. Here, too, the assertion of the government that these American citizens are agents of the PLO, while pertinent to the court's assessment of the merits of their First Amendment argument, *see* Part III(C), *infra*, does not prevent the

---

7. As a general proposition, the First Amendment protects speech no matter who the speaker is. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 784–85, 98 S.Ct. 1407, 1420, 55 L.Ed.2d 707 (1978); *Lamont, supra,* 381 U.S. at 306–07, 85 S.Ct. at 1496. That proposition, though, is not without limitation. For instance, a political boycott is generally protected by the First Amendment, but is unprotected when conducted by a labor union. *Compare NAACP v. Claiborne Hardware, supra,* 458 U.S. at 911–15, 102 S.Ct. at 3424–26 (1982), *with Int'l Longshoremen's Ass'n, AFL–CIO v. Allied Int'l, Inc.,* 456 U.S. 212, 226, 102 S.Ct. 1656, 1664, 72 L.Ed.2d 21 (1982). A limitation would also be applicable to foreign powers, under our reasoning in this opinion.

application of the First Amendment to the statute under attack.

## B. The Level of Scrutiny.

■ A content based restriction on political speech in a public forum is "subjected to the most exacting scrutiny." *Boos v. Barry*, —— U.S. ——, 108 S.Ct. 1157, 1164, 99 L.E.2d 333, 345 (1988). In contrast, an incidental restriction on speech—one which is not aimed explicitly at the content of speech or at prohibiting all speech about a subject, but rather at some other object—is subject to a somewhat more deferential inquiry. *See City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804–05, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984) (*quoting United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968)). We believe the appropriate inquiry is framed by *O'Brien* and its progeny, rather than the exacting standard applied most recently in *Boos v. Barry* and *Meyer v. Grant, supra.*

■ The ATA does not, on its face, single out for punishment advocacy of the PLO's doctrines. *See Brandenburg v. Ohio*, 395 U.S. 444, 448–49, 89 S.Ct. 1827, 1830, 23 L.Ed.2d 430 (1969). Instead, the ATA prohibits specific activities: the receipt and expenditure of funds from the PLO and the maintenance of an office on behalf of the PLO. The ATA is directed at hampering the operations—speech-related or not—of a foreign entity, the PLO. Under the ATA's terms, a person can buy neither a newspaper advertisement nor any other item with PLO funds (assuming he possesses the requisite intent). While there is no question that these prohibitions have an effect on the free flow of information, the prohibitions are not themselves aimed at the flow of information. They are aimed at the PLO. In this regard, this case is fundamentally different from cases like *Buckley v. Valeo*, 424 U.S. 1, 15–17, 96 S.Ct. 612, 632–33, 46 L.Ed.2d 659 (1976), *Bellotti, supra*, 435 U.S. at 788–92, 98 S.Ct. at 1422–24 and *Meyer v. Grant, supra*, 108 S.Ct. at 1899–95. *Buckley* was a comprehensive challenge to the 1974 amendments to the Federal Election Campaign Act, which placed significant limitations on the contribution and expenditure of funds in federal election campaigns. In rejecting the applicability of *O'Brien*'s incidental restriction analysis, the Court explained that it had "never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a non-speech element or to reduce the exacting scrutiny required by the First Amendment." *Buckley*, 424 U.S. at 16, 96 S.Ct. at 633. At the heart of that analysis lies a determination that a statute explicitly limiting participation in election campaigns is aimed at speech. The fact that the expenditure of money is involved cannot work to shield the statute from the exacting scrutiny applied to such acts. The same conceptions underlay the Court's opinion in *Bellotti*, which also addressed electoral spending prohibitions. And, in applying strict scrutiny, the Court's recent opinion in *Meyer v. Grant* presents, in this respect, the same fundamental principle: the state law at issue in that case prevented the payment of money to circulators of petitions in favor of the consideration of initiatives in referendum elections. In order for an initiative to be considered in an election, a minimum number of petition signatures was required. The prohibition at issue in *Meyer v. Grant* thus was aimed directly at the petition circulating process—a process traditionally associated with the discussion and debate of political issues. *Id.*, 108 S.Ct. at 1886–88. Again, although the ATA undoubtedly has an incidental effect on the free flow of information, it is not directed at speech itself.

The ATA's *mens rea* requirement, that the actor have the purpose of furthering the interests of the PLO, does not make it a content based restriction on speech. That requirement does not distinguish between speech in favor of or against any particular ideology. Again, it is certainly true that the ATA's effect on speech will be lopsided, but this is not a prohibition which distinguishes between kinds of speech based upon their content, nor one which is aimed at prohibiting or limiting categories of speech. Justice O'Connor's

discussion of a statute which did do so, in *Boos v. Barry*, is instructive:

> Whether individuals may picket in front of a foreign embassy depends entirely upon whether their picket signs are critical of the foreign government or not. One category of speech has been completely prohibited within 500 feet of embassies. Other categories of speech, however, such as favorable speech about a foreign government, or speech concerning a labor dispute with a foreign government, are permitted.

*Id.,* 108 S.Ct. at 1162, 99 L.Ed.2d at 343.[8]

In essence, we believe that this statute is not a content based restriction directed at speech, and need not be subject to the "most exacting scrutiny." *Id.,* —— U.S. at ——, 108 S.Ct. at 1164, 99 L.E.2d at 345.

### C. Assessment of the ATA under O'Brien.

Pursuant to the teachings of *United States v. O'Brien, supra,* 391 U.S. at 377, 88 S.Ct. at 1679,

> government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction of alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Ibid.*

While the First Amendment does not require the ATA to be struck down, it defines parameters upon the permissible construction of the ATA. We find that the ATA permissibly restricts the transfer of funds to Lughod and Ajlouny, but should not be construed to prohibit Hovsepian's proposed office.

There is no question that the ATA was passed pursuant to a grant of legislative authority under Article I.[9] Although it has been argued that the ATA is a legislative encroachment of executive authority to conduct foreign affairs, we believe that inquiry into that matter—unnecessary to the decision regarding the PLO mission itself—would be unwise in this context. *Holtzman v. Schlesinger,* 484 F.2d 1307, 1309–12 (2d Cir.1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1035, 40 L.Ed.2d 286 (1974); *Crockett v. Reagan,* 558 F.Supp. 893, 898–99 (D.D.C.1982), *aff'd,* 720 F.2d 1355 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); *Atlee v. Laird,* 347 F.Supp. 689, 705–06 (E.D.Pa.1972) (three judge court), *aff'd mem.,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973); *see generally Baker v. Carr,* 369 U.S. 186, 211–13, 82 S.Ct. 691, 706–08, 7 L.Ed.2d 663 (1962). We are aware of no case striking down federal legislation as an encroachment of the executive's authority to conduct foreign affairs, and counsel for the plaintiffs has not brought any to our attention despite a specific inquiry to him at oral argument. There appears, therefore, no jurisprudence in this area, despite the existence of much legislation which has been criticized as an encroachment upon presidential authority to conduct foreign affairs. *E.g. War Powers Resolution,* Pub.L. 93–148, 87 Stat. 555 (codified at 50 U.S.C. §§ 1541–1548 (1982)) (requiring expanded role of Congress in decisions regarding deployment of armed forces abroad); *National Security Act of 1947,* ch. 343, 61 Stat. 495 (codified as amended at 50 U.S.C. §§ 401–432 (1982)) (establishing comprehensive national security program, including Department of Defense, Central Intelligence Agency and National Security Counsel, and providing for Congressional oversight of these agencies); *see also* § 1013 of the *Department of State Authorization Act for 1985,* Pub.L. 98–164, 97 Stat. 1062 (codified at 50 U.S.C.

---

**8.** That part of Justice O'Connor's opinion was joined by two Justices. Two other Justices joined in the conclusion reached in that part of the opinion but wrote separately to voice opposition to her application of the "secondary effects" analysis developed in *City of Renton v. Playtime Theaters, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), a case about zoning restrictions on adult oriented motion picture theaters. *Boos v. Barry,* —— U.S. at ——, 108 S.Ct. at 1171, 1171–72, 99 L.E.2d at 353, 353–54 (Brennan, J., joined by Marshall, J., concurring in part and concurring in the judgment).

**9.** U.S. Const. Art. I, § 8, cl. 1, cl. 3, cl. 10, cl. 18.

§ 1546a (Supp. I 1983)) (providing for expedited procedures in Congressional action requiring the removal of armed forces engaged in hostilities outside the United States).

Several cases speak of the President's broad power to conduct foreign affairs, observing that he is the "sole organ of the federal government in the field of international relations." The best known are *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936), and *United States v. Pink*, 315 U.S. 203, 229, 62 S.Ct. 552, 565, 86 L.Ed. 796 (1942).[10] However, none of these cases provides guidance here. *Curtiss–Wright*, for instance, despite its sweeping language about presidential authority, held that Congress could delegate decision making authority to the President in the area of foreign affairs without the kind of standards necessary for a constitutional delegation in domestic legislation. It did not speak to the division of power between the branches. *Pink* addressed only the division between the states and the federal government, holding that a state may not undermine federal policy in the area of foreign affairs. The case before us, in contrast, concerns the division of foreign affairs power between Congress and the President—a power which is certainly shared, though the specific boundaries have never been drawn.[11]

We believe the courts have left that matter to the political interplay of the other branches. *See Orlando v. Laird*, 443 F.2d 1039, 1043 (2d Cir.), *cert. denied*, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971). In addition, there is some merit to the suggestion that inquiry into this area is especially unwise where, as in this case, Congress and the President have acted in unison and no constitutional impasse has been presented. *Goldwater v. Carter, supra*, 444 U.S. at 997, 997, 100 S.Ct. at 533, 533 (statement of Justice Powell). We are therefore constrained to conclude that for purposes of First Amendment analysis the passage of the ATA was within Congress' constitutional power.

The avowed interest asserted by Congress in favor of the ATA is a tactical one—to deny the PLO the benefits of operating in the United States. 22 U.S.C. § 5201(b). The interest is not one related to the suppression of speech, as where picketing is prohibited or election campaign contributions are regulated, for instance. There are, of course, many benefits which accrue to organizations operating in the United States, including political stability, access to our press and capital infrastructure, and, as some members of Congress noted, the patina of legitimacy.[12] These benefits flow, at least in part, from our national commitment to the rule of law and our respect for individual liberties. In light of the many terrorist acts around the world for which credit has been claimed in the name of the PLO, we cannot say Congress was unreasonable in concluding that those commitments are not shared by the PLO, and that important American interests would be served by denying the PLO the benefit of operating in an environment fostered by that commitment. In the area of foreign affairs, a declaration by the coordinate branches of what is or is not in our national interest merits our deferential

---

10. *See also Haig v. Agee,* 453 U.S. 280, 289 & n. 17, 101 S.Ct. 2766, 2773 & n. 17, 69 L.Ed.2d 640 (1981); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 410, 84 S.Ct. 923, 931, 11 L.Ed.2d 804 (1964); *Harisiades v. Shaughnessy,* 342 U.S. 580, 589 & n. 16, 72 S.Ct. 512, 519 & n. 16, 96 L.Ed. 586 (1952); *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948).

11. Justice Jackson specifically recognized the general inapplicability of these cases to the question of division of power between the executive and legislative branches. *Youngstown Sheet & Tube, supra,* 343 U.S. at 634, 635 n. 2, 72 S.Ct. at 869, 870 n. 2. Indeed the lack of a defined division of power in this area is a common theme. *See generally* E. Collier, *Foreign Policy Roles of the President and Congress,* Cong. Research Serv. Rep. No. 86–163 F (1986); 1 *Restatement (Third) Foreign Relations Law of the United States* § 1, Reporters' Note 3 (1988).

12. 133 Cong.Rec. H 11,425 (daily ed. December 15, 1987) (statement of Rep. Burton) ("Legitimacy is a terrorist organization's greatest asset."); *accord* 133 Cong.Rec. S 6,451 (daily ed. May 14, 1987) (statement of Sen. Karnes).

respect. *Haig v. Agee, supra,* 453 U.S. at 307, 101 S.Ct. at 2782; *Harisiades v. Shaughnessy, supra,* 342 U.S. at 589, 72 S.Ct. at 519. There is at least a rational basis for the ATA, and a substantial and important government interest unrelated to the suppression of speech. It is tied up in the foreign policy goals of our nation: while it has an incidental effect on speech, the benefits denied the PLO go far beyond the benefits of free speech. It is this substantial interest that the ATA furthers.

Other interests, announced on the floor of Congress, are irrelevant to our analysis of the ATA. The prevention of terrorism in the United States,[13] and sending a message,[14] were mentioned. It is clear, however, that the ATA's restrictions on First Amendment freedoms are far greater than essential for furthering these interests. Indeed, the United States Attorney conceded at oral argument that there is no evidence that the PLO Mission has misused its position in any way for terrorist purposes. Transcript of oral argument, p. 18

(June 8, 1988). The prevention of terrorism is accomplished through statutes making it illegal.[15] Messages relating to foreign affairs can be as easily and effectively sent using the Concurrent Resolution process.[16]

The plaintiffs have urged us to undertake an inquiry into Congress' supposedly impermissible motive by pressing the argument that Congress' "real" purpose was in fact the suppression of speech.[17] That kind of inquiry is, under *O'Brien,* inappropriate in this context. The Court in *O'Brien* was faced with a similar argument and rejected it. *O'Brien, supra,* 391 U.S. at 382–85, 88 S.Ct. at 1681–84. If Congress has exercised a legitimate power, examination of its alleged ulterior speech suppressing motives is irrelevant. We conclude that the ATA furthers a "substantial or important government interest." *O'Brien, supra,* 391 U.S. at 377, 88 S.Ct. at 1679.

 The prohibitions related to spending and receiving the PLO's money are

---

**13.** 133 Cong.Rec. S 13,854 (daily ed. October 8, 1987) (statement of Sen. Lautenberg) ("there is a real fear that these offices in Washington and New York might be used as bases for terror"); 133 Cong.Rec. S 8,776 (daily ed. June 25, 1987) (statement of Sen. Simon) ("restriction of terrorism"); 133 Cong.Rec. S 6,450 (daily ed. May 14, 1987) (statement of Sen. Lautenberg); *id.* S 6,448–49 (statement of Sen. Dole).

**14.** 133 Cong.Rec. S 13,852 (daily ed. October 8, 1987) (statement of Sen. Grassley) ("That message is if the PLO wants to participate in the diplomatic process, the first step must be to renounce terror. It is this, and nothing more or less, that motivates our actions."); *id.* S 13,854 (statement of Sen. Lautenberg; 133 Cong.Rec. S 6,450 (daily ed. May 14, 1987) (statement of Sen. Lautenberg; 133 Cong.Rec. E 1,635 (daily ed. April 29, 1987) (statement of Rep. Kemp).

**15.** *E.g.* 18 U.S.C. Ch. 37, §§ 792 to 799 (1982 & Supp. IV 1986) (Espionage); *id.* Ch. 105, §§ 2151 to 2157 (1982 & Supp. II 1984) (Sabotage); 49 U.S.C.A.App. §§ 1472(i) to 1472(*o*) (West Supp. 1988) (aircraft hijacking and piracy); 18 U.S.C.A. § 2331 (West Supp. 1988) (terrorist acts abroad against United States nationals); 18 U.S.C. §§ 351, 1751 (1982 & Supp. IV 1986) (kidnapping and assassination of Congressmen, Supreme Court Justices and the President); *id.* Ch. 81, §§ 1651 to 1661 (1982) (Piracy); *id.* Ch. 115, §§ 2381 to 2391 (1982 & Supp. II 1984) (Treason, Sedition and Subversive Activities); *id.* § 831 (1982) (transactions involving nuclear materials); *id.* Ch. 40, §§ 841 to 847

(1982 & Supp. II 1984) (importation, maintenance, distribution and storage of explosives). *See also* Foreign Intelligence Surveillance Act, Pub. L. 95–511, 92 Stat. 1783 (codified, as amended, at 50 U.S.C. §§ 1801 to 1811 (1982 & Supp. II 1984)).

**16.** *See* 133 Cong.Rec. S 13,853 (daily ed. October 8, 1987) (statement of Sen. Bingaman) ("We have a responsibility to call the attention of the world to their hateful acts.... And I have consistently supported senate bills and resolutions to that effect."); E. Collier, *supra* n. 11, pp. 19–21 (discussing particularly effective resolutions), *e.g.* S. Res. 345, 99th Cong., 2d Sess., 132 Cong.Rec. S 1,338 (daily ed. February 19, 1986) (sense of the Senate that the election of Ferdinand Marcos in the Philippines was marked by such widespread fraud that it could not be considered a fair reflection of the will of the Philippine people).

**17.** *See, e.g.,* 133 Cong.Rec. S 12,854 (daily ed. October 8, 1987) (statement of Sen. Grassley) ("I think we ought to think twice before extending the first amendment right to foreign entities using our soil ... to carry out acts of terrorism or even preach that."); 133 Cong.Rec. E 2,249 (daily ed. June 4, 1987) (statement of Rep. Gallegly) ("it is ludicrous to allow the PLO free reign to spread their ideology of hate and violence"); 133 Cong.Rec. H 4,047 (daily ed. May 28, 1987) (referring to PLO ability to "distribute its propaganda").

essential to Congress' goal of denying the PLO the benefits of operating in the United States. We can perceive no alternative through which Congress could be expected to implement it. Moreover, Congress, as much as was possible, tailored the prohibitions of the ATA to assure that its impact would fall upon the PLO. As we have already pointed out, the ATA includes a *mens rea* element and its prohibitions, therefore, are unlawful only when undertaken with the purpose of furthering the PLO's interests. It also has a specific exemption for informational materials, which protects the interests of American citizens. *See Lamont, supra.* The incidental effect on the capacity of Lughod and Ajlouny to participate in the discussion of the important issues on which they are experts, while arguably lamentable, is permissible.

■■■ Hovsepian presents a different situation. The ATA, read in the broadest possible way, prohibits Hovsepian from establishing or maintaining his proposed informational office at the behest of the PLO. Hovsepian has specifically averred that he will in no way be acting as an official of the PLO. But he does wish to further the PLO's interests; and the PLO has requested him to open his office. Were the ATA to be read to prohibit that course of action, it would violate the requirement that the restriction be no greater than essential. It would be prohibiting Hovsepian from operating in the United States, not the PLO. The words "behest" and "direction" need not be given the broadest reading possible. Indeed, a more limited approach appears consistent with congressional intent.

The ATA's proponents apparently made a distinction between maintaining contact with the PLO on the one hand, and acting as an official of the PLO or being paid by it on the other. As Senator Grassley put it, the ATA does not "prohibit contact with the PLO. It prohibits *only a principal agency relationship* between the PLO and American citizens." [18] Instructing the House conferees to accept the ATA, Representative Burton explained, "the bill prohibits paid agents from operating an official office on U.S. soil." [19] Those who spoke to the limits of the ATA thus articulated at least some distinction based on an official relationship with or the receipt of payment from the PLO. The only member of Congress to argue against such a limiting interpretation was Senator Bingaman, a vigorous opponent of the ATA.[20] Certainly it is possible that in his zeal to defeat the ATA, Senator Bingaman put too expansive a gloss on the permissible interpretation. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 204 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976) (*quoting NLRB v. Fruit & Vegetable Packers & Warehousemen,* 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964)).

The ATA must be read to allay the problematic limitations on speech which would otherwise ensue, where, as here, Congress has not expressed a contrary intent. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council,* —— U.S. ——, 108 S.Ct. 1392, 1297–98, 99 L.E.2d 645, 654–55 (1988). So long as Hovsepian does not act in an official capacity as a representative of the PLO, so long as he does not accept funds from the PLO, he will not have violated the ATA.[21]

### IV

#### *The ATA as a Bill of Attainder*

The plaintiffs argue that the ATA is a Bill of Attainder. Although the act raises grave concerns in this respect, we conclude that the ATA cannot be struck down on these grounds.

---

**18.** 133 Cong.Rec. S 13,854 (daily ed. October 8, 1987) (emphasis supplied).

**19.** 133 Cong.Rec. H 8,790 (daily ed. October 20, 1987); *accord* 133 Cong.Rec. H 11,425 (daily ed. December 15, 1988) (statement of Rep. Burton) ("official paid agents").

**20.** 133 Cong.Rec. S 13,852 (daily ed. October 8, 1982).

**21.** These would obviously be questions of fact in any subsequent enforcement proceeding under general application of the ATA.

Article I of the Constitution forbids the passage of Bills of Attainder by Congress.[22] That prohibition stands in sharp contrast to the practice at English common law, where legislative enactments directed at individuals or classes of individuals were enforced by the English courts without indictment or trial. Although the phrase "bill of attainder" originally referred only to a penalty of death inflicted by a legislative body upon a named individual, the United States Supreme Court has, for more than a century and a half, considered the constitutional prohibition to cover a much wider field. *See Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323–24, 18 L.Ed. 356 (1867); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 132, 3 L.Ed. 162 (1810) (Marshall, C.J.) ("a bill of attainder may affect the life of an individual, or may confiscate his property, or may do both"). The Court has thus focussed both on whether punishment is inflicted and on whether the bill singles out an individual or fairly identifiable class. In *Cummings*, the Court noted that "[b]ills of this sort ... have been most usually passed in England in times of rebellion, or ... violent political excitement; periods in which all nations are most liable ... to forget their duties, and to trample upon the rights and liberties of others." *Cummings, supra*, 71 U.S. (4 Wall.) at 323 (*quoting* J. Story, *Commentaries on the Constitution* § 1344, at 217 (5th ed. 1891)).

Indeed, American experience bears witness to Justice Story's observation. *See United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (statute forbidding members of the Communist Party to serve as officer or employee of a union); *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) (three named government employees deprived of compensation because they were "subversives"); *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867) (attorneys practicing in federal courts required to take an oath that they had never aided the Confederacy); *Cummings, supra* (similar oath required for "priests and ministers of religion"). The laws struck down in *Brown, Lovett, Garland*, and *Cummings* were enacted either at times of national crisis or when the attention of Congress was drawn by public clamor to problems of widespread interest. In *Cummings* and *Garland*, the laws in question reflect the emotions and the punitive reconstruction policies during the post Civil War period. In *Lovett*, the statute at issue was passed in the midst of World War II and in the wake of wholesale investigations of federal employees. It was aimed at the removal from public office of three particular government employees deemed by Congress to be "subversive." In *Brown* the law was passed during a time when the Communist label was widely equated with subversion and Congress wished to purge the governing boards of unions affecting interstate commerce of a Communist presence.

■ The ATA reflects a sense of outrage entertained by a wide segment of the American people and their elected officials concerning the crimes of foreign terrorists.[23] On its face, it is an accusatory document penalizing PLO employees by closing their offices and effectively terminating their activities in the United States. Having been effectively singled out by Congress, they are left without any right of reply or appeal, without right to confront their accusers or submit evidence in an adversarial proceeding. They are terrorists by statutory implication but without the slightest proof of their involvement in terrorism. In short, they are subjected to penalties without the panoply of protective shields vouchsafed even to criminal aliens

---

**22.** U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."); *see also* U.S. Const. art. I, § 10, cl. 1 ("No State shall ... pass any Bill of Attainder....").

**23.** *See* 133 Cong.Rec. S 13,853 (daily ed. October 8, 1987) (statement of Sen. Grassley); S 13,851 (statement of Sen. Bingaman); *id.* at E 2,249 (daily ed. June 4, 1987) (statement of Rep. Gallegly); *id.* at H 4,047–48 (daily ed. May 25, 1987); *id.* at S 6,451 (daily ed. May 14, 1987) (statement of Sen. Karnes); *id.* at E 1,635 (daily ed. April 29, 1987) (statement of Rep. Kemp).

by the federal courts in criminal trials.[24]

The ATA and the statutes struck down in *Brown, Lovett, Garland* and *Cummings* underscore the evil foreseen by the Founders and sought to be remedied by the Bill of Attainder clause. Alexander Hamilton wrote:

> Nothing is more common than for a free people, in times of heat and violence, to gratify momentary passions, by letting into the government principle and precedents which afterwards prove fatal to themselves. Of this kind is the doctrine of disqualification, disfranchisement, and banishment by acts of the legislature. The dangerous consequences of this power are manifest.... [I]f it may banish at discretion all those whom particular circumstances render obnoxious, without hearing or trial, no man can be safe nor know when he may be the innocent victim of a prevailing faction. The name of liberty applied to such a government, would be a mockery of common sense.[25]

Much of the reason for our Nation's departure from English historical practice in this regard can be viewed as flowing from the structure of our Constitution, which requires the maintenance of a separation of the powers of government. Indeed, the two were linked as early as the battle for ratification of the Constitution itself. *The Federalist* No. 84 at 510–12 (Hamilton) (Rossiter ed. 1961); *see generally id.* Nos. 47–51 (Madison's classic series regarding the separation of powers).

We believe the ATA would present a classic Bill of Attainder were it not for the fact that, as we construe it, it is an exercise of Congress' foreign affairs powers. A basic tenet of our constitutional government is that the three branches of our government should be kept separate and independent of each other without encroachment of one upon the other and without the delegation of power from one to the other. The ban on bills of attainder can be viewed as an implementation of the doctrine of separation of powers. In *Brown,* the Court adopted that interpretation, in its instruction that the ban on bills of attainder is not to be construed as "a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." *Brown,* 381 U.S. at 442, 85 S.Ct. at 1711–12. The value of a ban on bills of attainder to a system of separated powers was described by Professor Tribe as reflecting "not only the judgment of the Framers that the legislative branch of government presented the greatest potential threat to liberty, but also the further conviction that *no* branch should be empowered unilaterally to inflict a serious hardship on particular individuals or groups." L. Tribe, *American Constitutional Law* § 10–6, at 657 (2d ed. 1988).[26]

An equally important set of implications flows from the fact, as we have pointed out in Part III(A), *supra,* that the PLO, as a foreign entity, stands outside the structure

---

24. The Constitution does not except non-citizens from the protections of the due process clause. *Yick Wo v. Hopkins,* 118 U.S. 356, 368–70, 6 S.Ct. 1064, 1070–71, 30 L.Ed. 220 (1886). The language prohibiting bills of attainder is sweeping, and the Supreme Court's interpretations of it have been expansive. We believe there is little doubt that the ban applies to bills of attainder directed at non-citizens. *See Flemming v. Nestor,* 363 U.S. 603, 612–21, 80 S.Ct. 1367, 1373–78, 4 L.Ed.2d 1435 (1960) (addressing and rejecting merits of bill of attainder attack by an alien, with no discussion of alien's right to invoke bill of attainder clause).

25. The passage is quoted in *United States v. Brown, supra,* 381 U.S. at 444, 85 S.Ct. at 1712 (*quoting* John C. Hamilton, *History of the Re-*

*public of the United States* 34 (1859) (*quoting* Alexander Hamilton)). *See also The Federalist* No. 78 (Hamilton) at 466 (Rossiter ed. 1961) ("Without [limitations such as the ban on bills of attainder], all the reservations of particular rights would amount to nothing."); *id.* No. 44 at 282 ("Bills of attainder ... are contrary to the first principles of the social compact, and to every principle of sound legislation....").

26. In his classic first edition, Professor Tribe stated: "By restricting the legislative process to the formulation of general rules, the bill of attainder clauses would guarantee an institutional fractionalization of power." L. Tribe, *American Constitutional Law* § 10–5, at 491 (1978).

of our constitutional system. Were it not for that fact, the line of demarcation between legislative and judicial functions would be pierced in this instance. Under the heading of "findings," Congress declared that the PLO is a terrorist organization responsible for a number of murders as well as piracy on the high seas. 22 U.S.C. § 5201(a). Congress set forth, as "determinations," a statement that the PLO "should not benefit from operating in the United States." *Id.* § 5201(b). Congress has therefore declared the PLO unlawful and rendered it unable to act as an organization in the United States. But in doing so, it has inflicted punishment on those few individuals in this country officially affiliated with the PLO, here by invitation of the United Nations—an invitation in which the United States has long acquiesced. These individuals suffer the kind of deprivation of livelihood which implicates the Bill of Attainder clause. *Lovett, supra; Garland, supra; Cummings, supra.*

The government argues that this Act prohibits future conduct only, and that any individual in the United States may avoid its operation by modifying his conduct. *See Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 853, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984). That argument places the form of the ATA above its substance. It deprives a specific group of individuals of rights based on past conduct, as found by Congress. It does so, it is true, by prohibiting future conduct. But the crux of the bill is not to prevent conduct thought to be dangerous to the populace, but to inflict punishment upon a select few. The provisions struck down in *Cummings, Garland, Lovett,* and *Brown* also prohibited future conduct, but on the basis of the fixed status of certain individuals. Those persons, too, could have avoided the application of the unconstitutional laws by ceasing to engage in their chosen occupations. That did not save those acts and it would not save this one. This Act, as the government construes it and seeks to enforce it, purports to prohibit only future conduct, but has the effect of inflicting punishment upon the PLO, its members and affiliates with only a *pro forma* judicial inquiry. As so construed, Congress has left almost nothing for the federal courts to do but lend their authority to the injunction sought by the Attorney General. The alleged undisputed facts [27] put forth by the government in support of its summary judgment motion, Fed.R.Civ.P. 56; S. & E.D.N.Y. Local R. 3(g), do little more than serve as the means of identification of defendants already prejudged and penalized by the statute. Such a broad adjudicative role for Congress, and such a minimal role for the court would not be consonant with the limitation placed upon the courts by Article III of the Constitution that only "cases" or "controversies" be decided. *See United Public Workers of America (C.I.O.) v. Mitchell,* 330 U.S. 75, 90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947) ("Judicial adherence to the doctrine of the separation of powers preserves the Courts for the decision of issues between litigants, capable of effective determination.").

The federal courts cannot be turned into an instrumentality of almost blind enforcement by legislative enactment, separate and apart from their traditional procedures. The ATA prescribes for the Courts a function of enforcement against individual defendants and persons classified as terrorists, affording them little more than notice of an impending penalty.

Nevertheless, the ATA does not violate the Bill of Attainder clause. It can be construed as an appropriate exercise of Congress' powers, operating, as we have explained above and in the related opinion, *United States v. PLO, ante,* to curb the PLO itself in the United States and not its Mission and its personnel at the United Nations. In this sense, it withstands First Amendment scrutiny and does not violate the Bill of Attainder clause.

27. For instance, the defendants are affiliated with the PLO; they and the PLO maintain the PLO Observer Mission with the purpose of furthering the interests of the PLO; they are present in New York.

The PLO is the subject of this legislation. It effectively penalizes individuals only in prohibiting them from acting in an official capacity as representatives of the PLO. Congress must have the power to do that, since the PLO, as a foreign political entity, stands outside our constitutional structure. *See* Damrosch, *supra*, 73 Va.L.Rev. at 515–34. Severing diplomatic relations with any nation, or declaring war against any nation, works hardships on American citizens employed by the foreign power or acting as its official representatives. But Congress may force an American citizen to choose between the full panoply of protections offered by the Constitution and voluntarily taking on an official role in the operations of a foreign power. *See* U.S. Const. art. I, § 9, cl. 8 (prohibiting U.S. citizens from accepting titles, presents or emoluments from foreign governments without the consent of Congress); 18 U.S.C. § 959 (1982) (criminalizing enlistment in foreign governmental service). *See also* 8 U.S.C. § 1481(a)(4)(B) (Supp. IV 1986) (mandating loss of U.S. citizenship for accepting, serving in or performing the duties of an office under a foreign government for which an oath of allegiance is required); *Vance v. Terrazas*, 444 U.S. 252, 263, 100 S.Ct. 540, 546, 62 L.Ed.2d 461 (1980) (statutorily defined voluntary act of expatriation, accompanied by intent to relinquish citizenship, sufficient to terminate U.S. citizenship).

V

*Conclusion*

The Anti–Terrorism Act, in order to survive constitutional scrutiny, must be interpreted narrowly. It may permissibly put a halt to the operations of the PLO in the United States apart from the Mission to the United Nations, and we so hold in *United States v. PLO, ante*. But we do not read it as prohibiting an information office of the nature proposed by Hovsepian—one which accepts no money from the PLO and in no sense purports to act in any kind of official capacity for the PLO. Thus narrowed, the Anti–Terrorism Act does not violate the limitations placed upon Congress by the First Amendment and the Bill of Attainder clause.

Summary judgment is granted in favor of Hovsepian.

Summary judgment, as requested by Lughod and Ajlouny, is denied.

Summary judgment, as requested by Mansour, is granted in part, *see United States v. PLO, ante*, and denied in part.

The action is dismissed with respect to the remaining plaintiffs for lack of standing.

SO ORDERED.